151 P.3d 692

**In the Matter of the GUARDIANSHIP OF Edith M. CARLSMITH, Incapacitated Person.**

No. 27569.

Supreme Court of Hawai'i.

Oct. 18, 2006.

As Amended Jan. 24, 2007.

Michael Jay Green, and Howard Glickstein, Honolulu, on the briefs, for Respondent–Appellant Edith M. Carlsmith.

Stuart M. Cowan, on the briefs, for Respondent–Appellant Carl Duane Carlsmith.

Jeffrey S. Portnoy, Rhonda L. Griswold, and Allison M. Mizuo (Cades Schutte, LLP), on the briefs, Honolulu, for Petitioner–Appellee Cynthia Carlsmith Crespi.

Russell Suzuki and Adina Kobayashi Cunningham, Deputy Attorneys General, on the briefs, for amicus curiae State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold, in this appeal by Respondents–Appellants Edith M. Carlsmith (Edith) and Carl Duane Carlsmith (Duane) [collectively Respondents], from the September 26, 2005 order granting in part and denying in part the motion of Petitioner–Appellee Cynthia Carlsmith–Crespi (Cynthia) for attorney's fees and sanctions (order) of the family court of the first circuit (the court)[1], and its September 26, 2005 judgment (judgment), which (a) sanctioned Edith to pay attorneys fees and expenses for failure to make discovery[2] pursuant to Hawai'i Family Court Rules (HFCR) Rule 37 (2006)[3], (b) precluded Edith

1. The Honorable Karen M. Radius presided over this matter.

2. Inasmuch as the September 26, 2005 order and judgment of the family court of the first circuit (the court) ordered the payment of attorney's fees and expenses as sanctions, the matter of sanctions is immediately appealable. *See In re Adam,* 105 Hawai'i 507, 516, 100 P.3d 77, 86 (App. 2004) (order and judgment sanctioning party to pay attorney's fees and costs in an unfinished guardianship proceeding were immediately appealable).

3. Hawai'i Family Court Rules (HFCR) Rule 37 (2006), entitled "Failure to make discovery; sanctions," mandates the imposition of sanctions and award of reasonable expenses and attorney's fees, in pertinent part, as follows:

(b) Failure to comply with order.

....

(2) SANCTIONS BY COURT IN WHICH ACTION IS PENDING. If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order *that the matters regarding which the order was made or any other designated facts shall be taken to be established* for the purposes of the action in accordance with the claim of the party obtaining the order;

....

(E) *Where a party has failed to comply with an order under Rule 35(a) requiring that party to produce another for examination, such orders as are listed in paragraph (A), (B), (C) of . this subdivision, unless the party failing to comply shows that the party is unable to produce such person for examination.*

In lieu of any of the foregoing orders or in addition thereto, the court *shall* require the party failing *to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the fail-*

and Duane from presenting evidence to establish Edith's alleged capacity until she submits to an independent medical examination (IME), (c) ordered Timothy Luria (Luria), as the duly-appointed temporary guardian ad litem (TGAL), to submit to the court names of licensed attorneys in the Republic of Panama who were competent and willing to serve as Guardian of the Person over Edith, and (d) denied Cynthia's motion for sanctions to the extent that it requested all pleadings, declarations, and evidence submitted by Edith and/or Duane, be stricken,[4] that (1) the TRO herein is not void inasmuch as (a) the guardianship proceeding in the instant matter was properly initiated, (b) the TRO was accompanied by an appropriate action for further relief, (c) Respondents waived any objection to the sufficiency of service of the guardianship petition and TRO, and (d) the court had subject matter jurisdiction to issue a TRO in relation to a guardianship matter; (2) sufficient evidence exists to support the issuance of a TRO; (3) no error exists as to the retention of a TGAL; (4) no error exists with respect to the court's December 22, 2005 findings of fact (findings) and conclusions of law (conclusions); and (5) no reversible error exists as to the court's November 26, 2003 finding no. 4 that "[Edith] was served with the [guardianship p]etition through her Hawai'i attorneys" inasmuch as Edith waived any objections to any defect in the manner in which she was served. Accordingly, we affirm the court's September 26, 2005 order and judgment, and remand this case for further proceedings consistent with this opinion.

## I.

The following is gleaned from the record and the parties' briefs. Edith is 100 years old and currently a resident of the Republic of Panama. Edith has a son, Duane, who also lives in Panama, and a daughter, Edith Gayle Carlsmith (Gayle). Edith has two granddaughters, Annaliese Carlsmith (Annaliese), who lives in southern California, and Cynthia, a resident of the island of Hawai'i, both of whom are Duane's daughters.

Prior to her relocation to Panama sometime in November 2003, Edith lived in San Rafael, California at a retirement condominium community called Smith Ranch. Sometime in February 2003, Edith designated Annaliese and Cynthia as her agents in her Advanced Health Care Directive to make treatment decisions on her behalf if necessary. Subsequent to that, Edith claims in her opening brief that Annaliese asked her if she could borrow $200,000 to buy a house closer to Edith's residence, but Edith refused. In June 2003, Edith suffered a mild stroke and was hospitalized. Following her hospitalization, she returned to her home in California. Duane later moved to Smith Ranch from Panama to stay with Edith. A caregiver, Linda Manyisha (Linda), was engaged to care for Edith. In August 2003, Duane also hired Beverley Shungu–Omba (Beverley) to care for Edith.

Sometime in late September or early October 2003, Annaliese and Cynthia were contacted by Linda and Beverley, who expressed their concern about Duane's alleged plan to take Edith with him to Panama, as well as for Edith's well-being. According to Cynthia in her answering brief, it was related to her that Duane took a number of steps to isolate Edith from her family, including (1) removing Edith's telephone from her bedroom despite her desire to keep it there so she could remain in contact with Cynthia and other relatives, (2) berating other members of the Carlsmith family, and (3) instructing Edith not to talk to Gayle, Annaliese, or Cynthia.[5] In addition, Cynthia avers that Duane failed to care for Edith despite her having bruises, and that he cancelled Edith's appointments with her physical therapist, massage therapist, and speech therapist until

*ure was substantially justified or that circumstances make an award of expenses unjust.*
(Emphases added.)

4. Petitioner–Appellee Cynthia Carlsmith–Crespi (Cynthia) does not appeal from this portion of the court's order.

5. As noted, *infra*, the affidavits of Linda and Beverly support Cynthia's assertions against Duane.

the bruises were gone.[6]  Because of Linda's and Beverley's concerns, Annaliese and Cynthia contacted the police and the California Department of Social Services (CDSS).  After investigating the concerns brought to their attention, the police and the CDSS declined to intervene, apparently finding no abuse.

On October 8, 2003, Edith and Duane flew to Honolulu in order to inter the ashes of her son, Donn, to consult with her estate attorney, and to arrange for the donation of some of her art objects.  During this time, Respondents state that an evaluation was performed to determine Edith's competency to handle her estate affairs.  The evaluation reported, *inter alia*, that Edith had "hearing and visual difficulties that probably limit her communication skills but not her mental skills."

On October 22, 2003, Cynthia filed a Petition for Appointment of Guardian of the Person of an Incapacitated Person with the court (the guardianship petition).  It stated that Edith was an "adult currently within the jurisdiction of t[he family c]ourt" with "no current address."  The guardianship petition alleged that the appointment of a guardian was necessary "because [Edith] is incapable of making responsible decisions concerning herself and her affairs."  The guardianship petition added that "[t]he degree of her incapacity cannot be assessed at this time because she has been isolated from her family members by ... Duane, who has deprived her of telephone use, prevented family members from seeing her, and has removed her from her home with the intent to move her to Panama, where Duane resides."  The guardianship petition requested that the court find that Edith is an incapacitated person as de-

fined in Hawai'i Revised Statutes (HRS) § 560:5–101(2) (1993)[7] and that the appointment of a guardian is necessary in order to provide continuing care and supervision of Edith.

An Ex Parte Petition for [TRO] and Immediate Appointment of Guardian (TRO petition) was also filed.  Attached to the TRO petition were affidavits of Cynthia, Linda, Beverley, and Cynthia's counsel.  Also appended was a letter dated October 21, 2003 (first letter) from Dr. Patricia Blanchette (Dr. Blanchette) stating that, in her opinion, Linda's and Beverley's affidavits raised the possibility of undue influence, isolation, and physical abuse and that "urgent steps ... be taken to prevent Duane ... from further isolating his mother[.]"  Dr. Blanchette recommended in the first letter that Edith "undergo an evaluation to determine her competence to make her own decisions regarding her person and her healthcare."  Cynthia requested that an IME of Edith be performed by a board-certified geriatrician.  According to Respondents, "[n]o attorney signed either the [guardianship petition] or the [TRO petition]."

On October 24, 2003, the court entered a TRO requiring that Edith remain in the State of Hawai'i for 90 days and prohibited any person from removing her from Hawai'i without first informing the court.  The basis for the TRO is stated as follows:

> Based upon the [TRO] Petition ..., the affidavits of ... Cynthia ... and others, and the opinion of Dr. ... Blanchette, and pursuant to [HFCR] Rule 65(b) ..., the [c]ourt finds there is probable cause to believe that a past act or acts of mental or physical abuse against, or undue influence

---

6.  According to Respondents–Appellants Carl Duane Carlsmith (Duane) and Edith Carlsmith (Edith), the bruises were caused by Aggrenox, a blood-thinner prescribed for Edith, which causes patients to bruise easily "by just sitting down a little hard, or even just coughing."

7.  Hawai'i Revised Statutes (HRS) § 560:5–101(2) (1993) defined "incapacitated person" as any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent that the person lacks sufficient understanding or capacity to

make or communicate responsible decisions concerning one's person[.]

HRS § 560:5–102 (Supp.2005) redefines "incapacitated person" as

an individual who, for reasons other than being a minor, is unable to receive and evaluate information or make or communicate decisions to such an extent that the individual lacks the ability to meet essential requirements for physical health, safety, or self-care, even with appropriate and reasonably available technological assistance.

Haw. Sess. L. Act 161, part of § 1, at 665.

over, ... Edith ..., have occured[occurred], and that she may be at risk of being taken out of the country against her will or that she may lack capacity to make any decisions regarding her health care and domicile.

The court also appointed Luria as TGAL, ordered that Duane deliver Edith's passport to the clerk of that court, and ordered all parties to appear in court on October 28, 2003. On October 24, 2003, the TRO and guardianship petitions were delivered to Edith's counsel. According to Respondents, however, "[a] copy was delivered to the Carlsmith Ball LLP (the Carlsmith firm) offices a few minutes before 5:00 p.m. on Friday, October 24, 2003. [Mary Jane Connell], to whom it was addressed, was already gone for the weekend."

On October 28, 2003, Edith appeared before the court represented by counsel and Luria. Also present were Duane, appearing *pro se*, and Dr. Charman J. Akina (Dr. Akina). Prior to proceeding with the hearing, the court questioned Edith to confirm that she had received a copy of the TRO and guardianship petitions. Edith's counsel indicated that Edith had, and represented to the court that he had read both petitions to her because she was legally blind. He then declared that Edith desired to proceed with an evidentiary hearing. Duane indicated that he had not received copies of the TRO or guardianship petitions but he informed the court that he would obtain a copy from the Carlsmith firm and that he knew what the case was about.

On October 29, 2003, Cynthia's counsel served a copy of the TRO and guardianship petitions on Duane, through his counsel.

On October 31, 2003, Edith filed a Motion to Vacate the TRO and Appointment of Guardian Ad Litem and to Dismiss the Petition for Lack of Jurisdiction (motion to vacate).[8] On the same day, Duane filed his response to the TRO and guardianship petitions. Duane's response contested factual allegations, but raised no procedural arguments.

On November 5, 2003, the TGAL submitted a report indicated he had spoken with Edith's primary treating physician in California, Dr. James D. Taylor, who reported to him that during his visits with Edith, he did not notice any signs of abuse. The TGAL also spoke with Dr. George Seberg, who examined Edith at his office in Honolulu on October 13, 2003. Dr. Seberg expressed Edith's ability to make informed decisions but did not discuss any opinion as to whether Edith was subject to undue influence.

On November 5, 2003, the court heard, *inter alia*, the parties' jurisdictional arguments. After oral arguments, the court ruled that it had jurisdiction over Edith and that jurisdiction was concurrent with the State of California. The court stated that Duane was free to return to Panama, but explained the reasons for disallowing Edith from leaving. It said:

THE COURT: I'm going to make the following order: The record this [c]our; [sic] took jurisdiction based upon the petition and affidavits which as set forth in those affidavits appear to this [c]ourt that there might, whether there was a possibility of a danger to an elderly woman who was within the state, and pursuant to [HRS c]hapter 560, the [c]ourt does have jurisdiction if persons are within the State of Hawai'i.

The question, and in addition, this [c]ourt under the adult abuse statutes has wide jurisdiction to be able to prevent adult abuse if and when it's suspected to be occurring, and those statutes have been passed after 1991, but they all exist and give this [c]ourt wide jurisdiction, wide power, wide discretion with regard to elderly people.

The [c]ourt is not prohibiting Duane ... from going to Panama. That's totally within his right as a U.S. citizen. *The reason I issued a [TRO] that [Edith] not go is to be able to have an independent evaluation of was she competent, was there abuse going on, would there be any abuse within the State of Hawai'i while she was here [sic].*

8. An amended motion was subsequently filed on December 1, 2003, in which Duane joined.

(Emphasis added.) At the hearing's conclusion, the court indicated that it would be issuing a further written order regarding its concurrent jurisdiction and the logistics for an IME.

On November 7, 2003, Edith exhibited symptoms of a stroke and was admitted to the Queen's Medical Center (Queen's Hospital) where she remained under observation for approximately one week. On or about November 24, 2003, following her discharge from the hospital, Duane took Edith to Panama. On November 26, 2003, Edith's counsel filed a document with the court indicating "that EDITH M. CARLSMITH may have left the jurisdiction of the State of Hawai'i." (Capitalization in original.)

On November 26, 2003, the court entered an order finding that Edith was subject to the jurisdiction of the court and relating that "[Edith] was served with the Petition through her Hawai'i attorneys." The court ordered that an IME be performed by a court-appointed physician. The court also entered the following orders:

2. The [c]ourt amends the [TRO] issued on October 24, 2003 that [Edith] shall not leave the United States for the next 90 days. [Edith] shall not leave the United States for the next 90 days. [Edith] may return to her home in San Rafael, California or other United States location as long as she informs the [TGAL] of her travel itinerary and address and telephone number.

3. The [TGAL] shall arrange for appropriate access for family members to [Edith].

4. The [TGAL] shall arrange for [an IME] as to the competency of [Edith]. Said examination shall be conducted either in Honolulu or in California depending upon [Edith's] location and the availability of [Edith] and the physician.

On December 8, 2003, Edith, through present counsel, filed a motion for reconsideration of the court's November 26, 2003 order. The motion for reconsideration raised issues related to the court's findings and order, but did not contend that Edith was not properly served or that process or service was defective. Immediately prior to the court-sched-

uled hearing on December 17, 2003, Edith's counsel filed an "amended" Motion to Vacate and Dismiss, this time challenging service of process.

At the hearing on the motion for reconsideration, the court ruled on the issue of service in the following manner:

As to issues of service of [Edith] and [Duane], Edith clearly had a copy. I crossed out that she could be served by the, leaving it with the Carlsmith firm because quite frankly[,] given the pleadings, I wasn't certain whether the Carlsmith firm would have access to [Edith], and therefore, I did not want that to be considered service, *but when [Edith] herself appeared and her attorney ... indicated that he had read the entire document to her, that they wished to have testimony to show that this [c]ourt should not issue any kind of order for examination [or] continue this matter in any way, this [c]ourt considered [Edith] as having been served and having notice of all of the pleadings and order I entered.*

*As to [Duane], he appeared. He indicated that he didn't have a copy, but he would get one from the Carlsmith firm, and knew the substance of what this case was all about, and he's an attorney licensed to practice law in the State of Hawai'i as far as I know and raised no issue about service.*

(Emphasis added.)

On December 11, 2003, the court issued orders to show cause directed at Edith and Duane regarding their apparent failure to comply with the TRO. Edith was served with the order to show cause thorough her present counsel and her former counsel. Duane was served through his counsel.

On January 15, 2004, Duane filed a Motion for a "Competency Examination" of Edith in Panama. Attached to this motion was a declaration from Dr. Akina opining that, based on his observations of Edith, Edith did not display any signs of mental incompetence and that Edith had scored highly on a mental competency test performed by a doctor in Panama. On January 23, 2004, the court issued an order finding Duane and Edith in

civil contempt for violating the TRO. That order reiterated that the November 26, 2003 order requiring an IME remained in effect and that upon Edith's return to the United States, she must undergo an IME. That order also imposed a fine of $10,000 per day against Duane until he returned with Edith to Hawai'i.

On February 23, 2004, Dr. Blanchette wrote a second letter (second letter) to Cynthia's counsel which included her assessment of Edith's medical records. An affidavit by Dr. Blanchette accompanied the second letter along with her curriculum vitae (CV). In the affidavit Dr. Blanchette stated that she was "authorized and competent to make this declaration based on personal knowledge." In addition, Dr. Blanchette declared that "[a]ttached hereto ... is a true and correct copy of my Curriculum Vitae" as well as a "true and correct copy of a letter from me to Rhonda L. Griswold, dated February 23, 2004, setting forth opinions I have reached, based upon documents submitted to me." In the second letter, Dr. Blanchette states

> I have been an expert in Alzheimer's disease and other forms of dementia for the past twenty years. I have done research and published in peer reviewed journals on this topic. I am considered a national expert on the subject, and have been affirmed as an expert in competence in both state and federal court.

Dr. Blanchette noted that Edith's medical records included a discharge summary from Dr. Seberg reporting that following admission, Edith "could not remember [three (3) ] objects, and she could no longer name [six (6) ] utensils in the kitchen or [six (6) objects in the hospital room]." Dr. Blanchette further recounted that in a progress report dated November 13, 2003, or a day prior to Edith's discharge, it was reported that Edith's condition was "A & Ox1." According to Dr. Blanchette, "A & 0x1" means that a person is alert and oriented only to person, place, or time and the word " 'alert' in a medical sense means the person is awake,

not sleepy or obtunded. It does not mean the person is mentally competent." Finally, Dr. Blanchette opined that "[t]he record provides strong evidence of a physically frail, mentally incapacitated person whose 'baseline' is seriously impaired to the point she simply knows who she is, [and] does not recognize others even when informed of who they are." It appears that there were no objections raised as to the second letter.

On March 14, 2004, a hearing was held before the court on Duane's motion for a "competency examination." Duane's motion was granted and it was ordered that the parties submit CVs as to the proposed physicians to complete the competency examination. On April 23, 2004, a written order was entered to that effect.

On April 8, 2004, Edith's other counsel filed a Petition for Writ of Prohibition or, in the Alternative, for Writ of Mandamus (writ of prohibition) before this court. Duane joined in that petition. They argued that the TRO issued by the court on October 24, 2003 was invalid because, among other arguments, (1) the TRO was not properly initiated, (2) the TRO was not accompanied by an appropriate application for further relief, (3) Edith was never served with the guardianship petition so that the court never acquired jurisdiction over her person, and (4) there was insufficient evidence to justify issuance of a restraining order. On August 27, 2004, this court issued an Order Denying the Writ of Prohibition, dismissing that petition "without prejudice to any eventual remedy [Petitioners] may have by way of appeal."[9] *Carlsmith v. Radius*, Nos. 26942 & 26943, 2004 WL 1949849 (Aug. 27, 2004). Subsequently, Duane and Edith submitted names and CVs of proposed physicians who could perform the IME.

On December 22, 2004, an Order Appointing Physician for Examination was filed by the court, designating Dr. Hernando Ponce (Dr. Ponce), a physician whose practice is located in Panama City, Panama, to perform the IME of Edith in Panama, unless Duane

9. This court stated that a writ of prohibition "is an extraordinary remedy that will not issue unless the petitioner demonstrates a clear and indisputable right to relief and a lack of other means to adequately redress the alleged wrong or obtain the requested action." *Carlsmith v. Radius*, Nos. 26942 & No. 26493, 2004 WL 1949849 (Aug. 27, 2004).

returned Edith to California or Hawai'i by January 10, 2005, and allowing her to then be examined by the physician Duane wished to designate as an IME doctor. Duane did not return Edith to California or Hawai'i by that date. Dr. Ponce then attempted to arrange for an IME of Edith in Panama but was unsuccessful in his attempts to do so. The court, in its December 22, 2005 finding no. 24 determined that Edith "did not submit to an IME by Dr. Ponce nor did Duane make [Edith] available for an IME by Dr. Ponce in Panama."[10]

On March 4, 2005, Luria filed an Ex Parte Motion for (1) Order to Show Cause Why Court–Appointed Physician Has Been Denied Access to Edith to Conduct Examination as Ordered, and (2) Order Scheduling Hearing of Guardian Ad Litem's Motion for Further Extension of TRO and Order for Payment of $400.00 to Court Appointed Physician Concurrently With Order to Show Cause And Before [sic] March 15, 2005 (order to show cause motion).

At the March 30, 2005 hearing on Luria's order to show cause motion, the court orally ruled, *inter alia*, that the IME in Panama be completed by April 15, 2005. On June 2, 2005, the court entered its written Order Regarding Order to Show Cause, ruling as follows:

> 2. ... [T]he [c]ourt finds that insufficient evidence has been presented in support of any contention that the [c]ourt violated Panamanian law or any international treaty in the [c]ourt's Order (filed April 30, 2004) Granting [Duane]'s Motion for [a] Competency Examination filed on December 22, 2004. Further, the [c]ourt finds that since no objections [or] arguments by any party or interested person were made during the pendency of [Duane]'s Motion for a "Competency Examination" of Edith ... in Panama, filed on January 15, 2004, and at the hearing of said motion on March 17, 2004, on the grounds that, if the said motion were granted, [Edith]'s rights would be violated under Panamanian law [or] any international treaty, those objections and arguments have been waived.

> 3. As to Edith ..., the [c]ourt continues to have serious concerns regarding her competency based on the record and file of this case. The [c]ourt finds that there is no evidence that either [Cynthia] or the Guardian Ad Litem has traveled to Panama to try to contact [Edith] or that [Cynthia] caused emotional, mental, or physical stress to [Edith]. Had [Duane] not left Oahu with his mother, [Edith], and not procured a new passport for her, traveling with her to Panama, all contrary to the [c]ourt's order, [Edith] would have been examined in Hawai'i as ordered, and evidence subject to cross-examination would have been adduced instead of a series of Declarations [or] Affidavits from individuals not subject to cross-examination.

> 4. The "competency examination" of Edith ... in Panama as ordered pursuant to the [c]ourt's Order Granting Motion for [a] Competency Examination filed on April 30, 2004, and Order Appointing Physician for Examination filed on December 22, 2004, shall be completed by April 15, 2005.

The court noted that Edith was not made available for an IME by April 15, 2005, or any other date.

On April 19, 2005, Cynthia filed her Motion for Attorney's Fees and Sanctions Against Edith and Duane (the motion). The motion requested an order (1) establishing that Edith is an incapacitated person who lacks sufficient understanding or capacity to make or communicate decisions regarding her person, (2) prohibiting Duane and Edith from opposing such established fact or presenting any evidence as to Edith's alleged capacity, (3) striking any and all pleadings, declarations and evidence submitted by Edith and/or Duane to establish Edith's alleged capacity, and (4) granting Cynthia an award of attorney's fees and expenses and judgment thereon against Edith and Duane, jointly and severally, on the grounds that they violated the TRO as amended by the court's November 26, 2003 order, and failed to make Edith available for the IME as mandated in the court's November 26, 2003 order and its April 23, 2004 order granting Duane's motion

10. Respondents do not challenge this finding by the court.

for a competency examination in Panama. Cynthia requested that the amount of $208,196.57 in attorney's fees and $13,202.01 in costs be sanctioned against Respondents.

On August 4, 2005, Edith filed a memorandum in opposition arguing that (1) the TRO was void and unenforceable, (2) the Order for an IME was procedurally defective, void, and unenforceable, (3) the court lacked jurisdiction to order a medical examination in Panama or, in the alternative, had not taken the steps necessary to render its order enforceable, and (4) HFCR Rule 37 sanctions are available only for violations of a discovery order.

On September 26, 2005, the court issued the order and judgment from which Respondents appeal. It was ordered, *inter alia*, that (1) Respondents "are precluded from presenting any evidence to establish [Edith's] alleged incapacity until such time as she submits to an [IME] by [Dr. Ponce] or by any other physician chosen by the [c]ourt," (2) under HRS § 560:5-303(b) (1993),[11] "the person alleged to be incapacitated is entitled to be represented by an attorney to present evidence [and] to cross examine-witnesses" but that those safeguards exist in full "if [Respondents] comply with the [c]ourt's order that [Edith] undergo the [IME,]" (3) Edith is an incapacitated person and that

appointment of a guardian is necessary in order to provide her with continuing care, and (4) the request for attorney's fees and costs by Cynthia be granted in full and that said fees and costs were to be paid from Edith's funds, in the amount of $239,125.07. On October 25, 2005, Edith timely filed her notice of appeal and Duane filed his notice of cross-appeal pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4.1 (2006).[12]

On December 22, 2005, following the filing of Edith's notice of appeal and Duane's notice of cross-appeal, the court entered its Findings of Fact, Conclusions of Law, and Order Granting Petitioner's Motion for Attorney's Fees and Sanctions Against Edith and Duane (December 22, 2005 order).

## II.

### A.

On appeal, Respondents raise as points of error that (1) the October 24, 2003 TRO was void inasmuch as (a) the action was not properly initiated, (b) the TRO action "was not accompanied by an appropriate application for further relief, in violation of HFCR Rule 65[13] and ... was never served on Edith ... [or Duane]," (c) "Edith ... was never served with the petition, so the [c]ourt never ac-

**11.** HRS § 560:5-303(b) (1993), entitled "Procedure for court appointment of a guardian of the person of an incapacitated person," provides, in pertinent part:

> (b) Upon the filing of a petition, the family court shall set a date for hearing on the issues of incapacity and, *if at any time in the proceeding, the court determines that the interests of the allegedly incapacitated person are or may be inadequately represented, it shall appoint a guardian ad litem. The person alleged to be incapacitated may be examined by a physician or licensed psychologist appointed by the family court who shall submit a report in writing to the court and may be interviewed by a family court officer or other person designated by the family court.* If so ordered by the family court, the family court officer or other person also shall interview the person seeking appointment as guardian of the person, shall visit the present place of abode of the person alleged to be incapacitated and the place it is proposed that the person will be detained or reside if the requested appointment is made, and shall submit a report in writing to the family court. *The person alleged to be incapacitated is entitled*

> *to be present at the hearing in person, and to see or hear all evidence bearing upon the person's condition. The person alleged to be incapacitated is entitled to be represented by an attorney, to present evidence, to cross-examine witnesses, including any person submitting a report and the family court officer or other person designated by the court to interview the person.* The issue may be determined at a closed hearing.
> (Emphases added.)

**12.** Hawai'i Rules of Appellate Procedure Rule 4.1(a) (2006), entitled "Cross-Appeals," provides the right to cross-appeal to any other party in civil cases involving multiple-party plaintiffs or defendants, "whether on the same or opposite side as the party first appealing[.]"

**13.** HFCR Rule 65(b) (2006), entitled "Injunctions," provides in pertinent part that "[e]very restraining order granted without notice shall be filed forthwith in the clerk's office and entered of record, *shall be accompanied by an appropriate application for further relief and notice of hearing, and shall be served forthwith upon any party or parties affected by the order.*" (Emphasis added.)

quired jurisdiction over her person," and (d) the court lacked subject matter jurisdiction to issue the TRO because HRS § 346–221 (1993) [14] applies and Cynthia lacked standing to invoke it; (2) insufficient evidence exists "to justify the issuance of the TRO depriving [Edith] of her liberty without notice and an opportunity to be heard"; (3) the appointment of a TGAL "should have been terminated on October 28, 2003, as a matter of law"; (4) HFCR Rule 65 "is unconstitutional on its face or as applied in this case because, in violation of the due process clause [of the Hawai'i Constitution], it creates subjective, standardless discretion authorizing drastic relief without notice, without any of the constitutionally necessary procedural safeguards"; and (5) the definition of an "incapacitated person" pursuant to HRS § 560:5–101 is unconstitutionally vague, overly broad, and not sufficiently definite." [15]   As its sixth point of error, Respondents challenge the court's December 22, 2005 findings and conclusions in the following manner: [16]

F.   The [c]ourt erred in making the following [findings] and [conclusions] in the [Findings], [Conclusions], and Order Granting Petitioner's Motion for Attorney's Fees and Sanctions Against Edith ... [and] Duane ... filed [December 22, 2005]:

1.   In FOF 5: "[Edith's counsel] stated that [Edith] had received a copy of the TRO and represented to the [c]ourt that he had read the [g]uardianship petition and TRO to [Edith]."

2.   FOF 9: "On October 29, 2003, [Cynthia's counsel] served file-marked copies of the [Guardianship] Petition, TRO Motion and Ex Part Petitions to Shorten Time upon [Duane] through ... [Edith's counsel]."

3.   FOF 12: "At about the time that she was released from Queen's Hospital,

[Edith] was oriented to her name only. [Edith] did not know where she was, nor could she recall the day, date, or time."

4.   In FOF 13: "On or about November 24, 2003, Duane and [Edith] went to Panama in violation of the TRO ...."

5.   COL 1: "This [c]ourt has jurisdiction to hear the Petition for Guardian[ship]."

6.   COL 9: "[Edith] violated the TRO entered on October 24, 2003 by leaving for Panama prior to the completion of an IME. Duane assisted [Edith] in violating the TRO. [Edith] and Duane violated the First and Second IME Orders."

7.   In COL 10: "... [Edith] and Duane were precluded from presenting evidence of [Edith's] capacity."

8.   COL 11: "Based on evidence that was before the court, the [c]ourt finds [Edith] incapacitated and in need of a guardian to provide for her continuing care."

Finally, Respondents, in their seventh point of error, argue that the court erred in its November 26, 2003 finding no. 4 that "[Edith] was served with the Petition through her Hawai'i attorneys." Respondents request that this court (1) vacate the judgment, (2) declare void ab initio the October 24, 2003 TRO and all subsequent findings, orders and sanctions, (3) order the court to dismiss the guardianship petition, (4) award Respondents their attorneys' fees and costs, and (5) grant such other relief as is just and equitable under the circumstances.

In her answering brief, Cynthia argues that (1) the TRO petition and guardianship petition were properly initiated, (2) the guardianship petition constituted the "appropriate application for further relief" required

---

**14.**  In general, HRS § 346–221 (1993), entitled "Purpose; construction," provides for the protection of elderly citizens who are mentally or physically impaired from abuse, neglect, or exploitation.

**15.**  As noted, *infra*, Respondents, in their reply brief, concede that the constitutionality of HFCR Rule 65 and HRS § 560–5:101(2) need not be reached.

**16.**  Respondents note that the court's December 22, 2005 order was filed after their respective notices of appeal had already been filed with this court.  Accordingly, they state that they had no opportunity to timely object to the findings and conclusions in that order.

under HFCR Rule 65 and Respondents had notice of the TRO, (3) Respondents waived personal service of the TRO petition and guardianship petition by appearing at the October 28, 2003 hearing and by failing to timely raise an objection regarding improper service, (4) the court had jurisdiction to issue the TRO, (5) ample evidence was submitted to support the issuance of the TRO, (6) the court was not required to terminate the TGAL on October 28, 2003 when Edith's own testimony established the need for an IME, (7) HFCR Rule 65 passes constitutional muster, and (8) Edith's medical records from Queen's Hospital were properly obtained by the TGAL and admissible as evidence showing Edith's lack of capacity.

In their reply brief, Respondents aver that (1) Edith was never served with the guardianship petition, "and because service is jurisdictional, the [c]ourt never acquired jurisdiction over her, rendering the [TRO] and all subsequent extensions, orders, findings and sanctions void[,]" (2) the court "lacked subject matter jurisdiction to issue the TRO" under HRS § 346-221, and (3) sufficient expert opinion was presented to show that Edith does not lack mental capacity and that Cynthia had the opportunity to depose and cross-examine these experts but failed to do so. Respondents conclude that the court never had in personam jurisdiction and lacked subject matter jurisdiction when it issued the TRO. Respondents also concede that the constitutionality of HFCR 65 or HRS § 560:5-101(2) need not be reached in order to (1) vacate the judgment, (2) declare void ab initio the October 24, 2003 TRO and all subsequent findings, orders and sanctions, (3) order the court to dismiss the guardianship petition, and (4) award Respondents their attorneys' fees and costs.

### B.

█ Respondents also seek review of the court's September 26, 2005 Order Denying Duane's Motion to Delay Rendering Decision; Motion to Reopen filed, and "all other rulings adverse to Respondent[s t]herein." In addition, Duane challenges the court's January 23, 2004 Order re: Orders to Show Cause Filed December 11, 2003 finding Respondents in civil contempt of court. Hawai'i Probate Rules (HPR) Rule 34, entitled "Entry of judgment, interlocutory orders, appeals[,]" provides for appeals of certain orders and judgments in the following manner:

(a) Entry of Judgment. All formal testacy orders, orders of intestacy and determination of heirs, orders establishing guardianship of the property, and orders establishing protective arrangements shall be reduced to judgment and the judgment shall be filed with the clerk of the court. Such judgments shall be final and immediately appealable as provided by statute. Any other order that fully addresses all claims raised in a petition to which it relates, but that does not finally end the proceeding, may be certified for appeal in the manner provided by Rule 54(b) of the Hawai'i Rules of Civil Procedure.

(b) Interlocutory Orders. *In order to appeal from any other order prior to the conclusion of the proceeding, the order must be certified for appeal in accordance with [HRS § 641-1(b) (1993) ].*[17]

(c) Final Judgment Closing Proceeding. At the conclusion of the proceeding, a final judgment closing the proceeding shall be entered and filed with the clerk of the court, at which time all prior uncertified interlocutory orders shall become immediately appealable.

(d) Appeals. Final judgments as to all claims and parties, certified judgments, certified orders, and other orders appealable as provided by law may be appealed pursuant to the Hawai'i Rules of Appellate Procedure applicable to civil actions.

17. HRS § 641-1(b) (1993), entitled "Appeals as of right or interlocutory, civil matters," states in full as follows:

(b) Upon application made within the time provided by the rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion from an order denying a motion to dismiss or from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it. The refusal of the circuit court to allow an appeal from an interlocutory judgment, order, or decree shall not be reviewable by any other court.

None of these orders fit within the classes of appealable orders under HPR Rule 34 and HRS § 641–1(b). We note that the guardianship proceeding has not been concluded, final judgment terminating the proceeding has not been entered, and these orders were not certified for appeal. Hence, those orders are not before us.

Appellate jurisdiction in the instant matter is limited to the correctness of the court's imposition of sanctions in its September 26, 2005 order and judgment, which implicates the issues of personal jurisdiction, subject matter jurisdiction, and personal service. Accordingly, we need only decide the issues relating to the court's jurisdiction over Respondents, its jurisdiction to issue the TRO, the propriety of the court's assessment of attorney's fees in the amount of $239,125.07, and imposition of sanctions against Respondents in the September 26, 2005 order and judgment.[18] *See In re Adam*, 105 Hawai'i 507, 516, 100 P.3d 77, 86 (App.2004) (ruling that "[i]mmediate appeal is allowed of a sanction order against a party that is immediately enforceable through contempt proceedings and that places the sanctioned party in immediate jeopardy of being found in contempt of court for failure to comply" (citing *Harada v. Ellis*, 60 Haw. 467, 480, 591 P.2d 1060, 1070 (1979))); *Kukui Nuts of Hawai'i, Inc. v. R. Baird & Co.*, 6 Haw.App. 431, 435, 726 P.2d 268, 271 (1986) (holding that immediate appeal is permissible as to a sanction order against a party that is reduced to an enforceable judgment).

### III.

Whether a court has jurisdiction over a case is a question of law reviewed under the right or wrong standard. *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Concerned Citizens of Palolo*, 107 Hawai'i 371, 380, 114 P.3d 113, 122 (2005). Findings of fact will not be disturbed unless "clearly erroneous." *Kienker v. Bauer*, 110 Hawai'i

97, 105, 129 P.3d 1125, 1133 (2006) (quoting *Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001)). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." *Id.* (brackets and ellipses omitted).

With respect to the issuance of a TRO, a relief in equity, "[t]he relief granted by a court [in] equity is discretionary and will not be overturned on review unless the … court abused its discretion." *Ueoka v. Szymanski*, 107 Hawai'i 386, 393, 114 P.3d 892, 899 (2005) (quoting *AIG Hawai'i Ins. Co. v. Bateman*, 82 Hawai'i 453, 457, 923 P.2d 395, 399 (1996)). Similarly, a " 'court's imposition of a discovery abuse sanction is reviewable on appeal for abuse of discretion. A … court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997) (quoting *Aloha Unlimited, Inc. v. Coughlin*, 79 Hawai'i 527, 532–33, 904 P.2d 541, 546–47 (App.1995)). In addition, "regardless [of] whether sanctions are imposed pursuant to statute, circuit court rule, or the trial court's inherent powers, such awards are reviewed for an abuse of discretion." *Gap v. Puna Geothermal Venture*, 106 Hawai'i 325, 331, 104 P.3d 912, 918 (2004) (citations, internal quotation marks and brackets omitted).

### IV.

With respect to point of error (1)(a), the action below was properly initiated. Respondents claim that when the action was filed, the guardianship petition (i) "did not include a summons, a purported violation of [HFCR] Rule 4,"[19] and (ii) "was not signed by an

---

18. To reiterate, the court's September 26, 2005 order and judgment sanctioned Respondents under HFCR Rule 37 by (1) ordering that Edith pay Cynthia's attorneys fees and expenses, (2) ruling that Respondents be precluded from disputing Edith's incapacity until Edith submits to an IME,

and (3) finding that Edith is an incapacitated person as defined in HRS § 560:5–101(2).

19. HFCR Rule 4 (2006), entitled "Process," provides in pertinent part that "[u]pon the filing of the complaint, the clerk shall forthwith issue a

attorney of record," in violation of HFCR Rule 11.[20]

### A.

### 1.

As to subpoint (i) of point of error (1)(a), it is noted that the current action was initiated by the filing of the guardianship petition pursuant to HRS § 560:5–309 (1993).[21] As provided by that statute, a notice of hearing, as opposed to a summons, is a fundamental requirement, as stated in pertinent part as follows:

> **Notices and guardianship proceedings.** (a) In a proceeding for the appointment or removal of a guardian of the person of an incapacitated person other than the appointment of a temporary guardian or temporary suspension of a guardian, *notice of the time and place of hearing shall be given by the petitioner to each of the following:*
>
> (1) *The ward or the person concerning whom the proceeding has been commenced* and the ward's or person's ·spouse, legal parents, and adult children;
>
> . . . .
>
> (b) Notice shall be served personally on the alleged incapacitated person, the person's spouse, the person's legal parents, and the person's adult children, if they can be found within the State. Notice to such of those who cannot be found within the

State and to all other persons except the alleged incapacitated person shall be given as provided in [HRS § ] 560:1–401. *Waiver of notice by the person alleged to be incapacitated is not effective unless the person attends the hearing or the person's waiver of notice is confirmed in an interview with the individual sent by the family court to interview the person.* Except as provided in [HRS § ]560:5–303, representation of the alleged incapacitated person by a guardian ad litem is not necessary.

(Emphases added.) [22]

■ Respondents appear to argue that HFCR Rule 4, which requires a summons, prevails over HRS § 560:5–309, which requires notice. The record before us indicates that a Notice of Hearing (the notice) was attached to the guardianship petition and was signed by the clerk under seal of the court, and indicated the name of the court, the parties involved, as well as the name and address of Cynthia's counsel. The guardianship petition to which the notice was attached, was file-stamped "October 24, 2003." The notice directed that the parties appear before the court on October 28, 2003 at 1:30 p.m., and forewarned that further action might be taken without further notice if a party failed to appear. At the October 28, 2003 hearing, Edith's ·counsel represented to the court that he had read all relevant documents to Edith.

In their reply brief, Respondents concede that "[i]t makes sense that [HRS § 560:5–

---

summons and deliver it to the plaintiff for service by a person authorized to serve process."

**20.** HFCR Rule 11 (2006), entitled "Signing of pleadings, motions, and other papers; sanctions," provides in pertinent part that "[e]very pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated."

**21.** Under HFCR Rule 81 (2006), entitled "Applicability," the HFCR applies, in pertinent part, to "(8) Guardianship of Person of Minors and Incapacitated Persons under HRS chapter 560, article V."

**22.** In 2004, the Legislature amended HRS § 560:5–309, specifying the contents of a notice of hearing for purposes of guardianship of incapacitated persons, in pertinent part, as follows:

> (a) *A copy of a petition for guardianship and notice of the hearing on the petition shall be served personally on the respondent. The notice shall include a statement that the respondent must be physically present unless excused by the court, inform the respondent of the respondent's rights at the hearing, and include a description of the nature, purpose, and consequences of an appointment. A failure to serve the respondent with a notice substantially complying with this subsection shall preclude the court from granting the petition.*

(Emphasis added.) The amendment became effective on January 1, 2005, and provided that it "shall not affect any action commenced, proceeding brought, or right accrued prior to its effective date." 2004 Haw. Sess. L. Act 161, § 38 at 708.

309] provides that attendance at the hearing waives notice of the hearing, but that does not address service of the initial pleading." Respondents argue that "[HRS § ] 560:5–309 is silent on service of the initial pleading," and that HFCR Rule 4(d)(3)(B) governs. HFCR Rule 4(d)(3)(B) provides for personal service of an initial pleading on an incompetent person and requires that a summons and complaint be served upon an incompetent person, "by delivering a copy of the summons and of the complaint personally."

By its terms, HFCR Rule 4(d)(3)(B) presupposes that the person being served has been declared incompetent. It has been held that "a person over whom a petitioner seeks to establish a guardianship enjoys a presumption of competency which may be relied upon until the contrary is shown." *Schaefer v. Schaefer*, 183 Or.App. 513, 52 P.3d 1125, 1128 (2002). (brackets and ellipses omitted). Inasmuch as Edith has not been declared incompetent, and in fact, Respondents argue otherwise, HFCR Rule 4(d)(3)(B) is inapplicable.

In addition, the citation by Respondents to *Carolina Freight Carriers Corp. v. Local Union # 61 of the Int'l Bd. of Teamsters, Chauffers, Warehousemen & Helpers of America*, 11 N.C.App. 159, 180 S.E.2d 461, *cert. denied*, 278 N.C. 701, 181 S.E.2d 601 (1971), is not helpful. In that case, a TRO was issued solely upon the filing of an affidavit. *Id.* at 462–63. No other pleadings were filed, and no summons were issued. *Id.* at 463. On appeal, the *Carolina* court ruled that the lower court did not have jurisdiction to issue the TRO, stating that a TRO procedure "is permissible only after an action is commenced [after the filing of a complaint or summons under North Carolina Rules of Civil Procedure] Rule 3." *Id.*

The aforementioned facts in *Carolina* are inapposite to the instant case. The TRO petition in the instant case was accompanied by the guardianship petition. The guardianship petition was filed before the court and satisfies the definition of a "complaint" under HFCR Rule 3 which defines "complaint" to include "any initial pleading required by statute." The TRO, as modified by the court,

was issued with the TRO petition, and no motions were made to strike both petitions.

■ Moreover, any objections by Respondents as to the lack of notice are deemed waived by Edith's appearance, her failure to object to the purported defect of notice or summons, and insistence upon proceeding with an evidentiary hearing. *See Kim Poo Kum v. Sugiyama*, 33 Haw. 545, 555–56, 1935 WL 3386 (1935) (holding that the "voluntary general appearance" by one party before the court in opposition to an application by another party to make it a party defendant, together with its subsequent appearance before the same court at the hearing on appeal "demanding the right to be permitted to introduce evidence upon the issues" therein, *"was wholly inconsistent with any other attitude on the part of [the first party] ... than a complete and voluntary surrender and submission to the general jurisdiction of the court for all purposes"* (emphasis added)); *cf. Young v. Chong*, 24 Haw. 95, 96, 1917 WL 1556 (1917) (ruling that defendants in that case "appeared generally and thereby waived all objections ... as to the summons ... and submitted themselves to the jurisdiction of the ... [court]" and reasoning that the purpose of summons "is to bring the defendant into court so that the court may have jurisdiction over his person and its object is accomplished when the defendant comes in without objection and submits himself to the jurisdiction of the court").

Hence, because Edith had notice of the petition and the hearing concerning the petition, and inasmuch as Edith voluntarily appeared without objection to the lack of summons or notice, and insisted that an evidentiary hearing proceed, no error exists as to subpoint (i) with respect to Edith.

### 2.

■ Similarly, with respect to Duane, as the court stated, he appeared before the court, indicated he did not have a copy of the TRO and the guardianship petition, "but would get a copy from the Carlsmith firm," and that Duane "knew the substance of what this case was all about." The court also noted that, to its knowledge, Duane was then

"an attorney licensed to practice law in the State of Hawaiʻi ... and raised no issue about the service."

As a rule, the defense of insufficiency of process or lack of service must be asserted in the initial pleading or made by motion, before pleading, if a further pleading is permitted. HFCR Rule 12(b)(4) & (5). The failure to raise the defense of insufficiency of process in a timely manner waives that defense. HFCR Rule 12(h). In addition, the failure to raise such a defense is also waived if omitted from a motion in which it could have been included. HFCR Rule 12(g).

According to Cynthia, on October 29, 2003, Duane was served a copy of the TRO and guardianship petition through Edith's counsel. Following service of these documents, Duane filed his response to the TRO and guardianship petitions wherein he contested the factual allegations "but raised no procedural arguments." Duane not having raised the defense of insufficiency of process in a timely manner or in a motion, we hold that the court did not err in ruling against him on the issue of service of process.

### B.

In regard to subpoint (ii), Respondents' objection under HFCR Rule 11 to the lack of a signature by an attorney of record in the petition, no error exists. Cynthia does not dispute that the petition was initially unsigned. Rather, Cynthia contends that "the memorandum in support of the [TRO petition] ... and memorandum in support of the [guardianship petition] *were* signed by counsel, as was the affidavit attached to the [TRO petition]." (Emphasis in original.) In addition, Cynthia asserts that under HFCR Rule 11, "[i]f a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant."

Cynthia's arguments are persuasive. As she notes in her answering brief, "when [Edith's] counsel sent a letter stating that Cynthia's signature rather than the signature of counsel indicated noncompliance with [HFCR] Rule 11, counsel for Cynthia immediately submitted amended signature pages

with counsel's signature." Hence, after the lack of a signature by a counsel of record was "called to the attention" of Cynthia's counsel, any defect under HFCR Rule 11 was cured and the requirements of that rule were satisfied.

Respondents' reliance on *State ex. rel. Friedman v. Dist. Ct.*, 81 Nev. 131, 399 P.2d 632 (1965), for the proposition that the filing of an errata does not cure any defect in the petitions, is similarly unpersuasive. In that case, the petitioner obtained a TRO from a trial court enjoining the respondent, Friedman, from proceeding in a civil action against the petitioner in California. *Id.* However, the TRO was not conditioned upon the posting of a bond, and did not provide reasons for its issuance, in violation of Nevada Rules of Civil Procedure (NRCP) Rules 65(c) & (d). *Id.* at 632–33. Friedman filed an action seeking nullification of the TRO based on these defects. *Id.*

One day before trial, the petitioner obtained, *ex parte*, an amended restraining order which required posting of a $1000 bond and provided reasons for its issuance. *Id.* The petitioner then contended that the issuance of the amended restraining order rendered Friedman's action moot inasmuch as the defects in the original TRO had been cured. *Id.* The *Friedman* court disagreed, observing that the amended restraining order, obtained *ex parte*, "was not accompanied by a motion for a preliminary injunction, nor was there a separate showing to authorize its entry without notice," *id.* at 634, in violation of NRCP Rule 65.

In this case, in contrast with *Friedman*, no substantive defect exists to render the TRO at issue invalid. The defect pointed out by Edith, the absence of counsel's signature, was cured as permitted by HFCR Rule 11. Following correction by Cynthia's counsel, no defects remained in the TRO petition. Hence, *Friedman* is inapplicable.

### V.

### A.

Points of error (1)(b) and (c), that the TRO action was not accompanied by an appropriate application for further relief or was never

served on Edith and Duane,[23] present no error. Respondents contend that HFCR Rule 65(b) mandates that "[e]very restraining order granted without notice shall be ... accompanied by an appropriate application for further relief." Respondents concede that "[t]he only document that could conceivably have met that description would have been the [guardianship petition] itself." However, Respondents maintain that the guardianship petition "was not an 'appropriate' application for further relief" since (1) it was filed in violation of HFCR Rules 4 and 11, and (2) the court did not have subject matter jurisdiction over the allegations in the petition which alleged elder abuse, and not incapacity. They argue that subject matter jurisdiction over allegations of elder abuse is conferred upon the court "only if the Department of Human Services is the [p]etitioner, and only if facts and circumstances are present which were never present in this case."

We first observe, as noted by Cynthia, that the guardianship petition requested "further relief" to the effect that the court, *inter alia,* find "that Edith ... is an incapacitated person as defined in [HRS] § 560–5:101(2)."[24] As earlier related, Respondents' objections to the guardianship petition under Rules 4 and 11 are unpersuasive. Hence, inasmuch as Cynthia's prayer in the guardianship petition that the court find Edith an "incapacitated person," literally satisfies the "appropriate application for further relief" as required by HFCR Rule 65(b), we discern no error in the issuance of the TRO in this respect.

### B.

We further hold that the court did have subject matter jurisdiction to issue the TRO in the present matter, contrary to Respondents' arguments in points of error 1(b) and (1)(d). HRS chapter 571 provides for the creation of family courts. *See* HRS § 571–1 (1993) (stating that "[t]his chapter creates within this State a system of family courts").

HRS §§ 560:5–106(2) and (3) (Supp.2005), part of the Uniform Probate Code, declare that "[t]he family court shall have exclusive jurisdiction over guardianships and related proceedings concerning incapacitated adults[,]" and "[w]here protective and guardianship proceedings relating to the same person have been initiated, they may be consolidated in the court as the court in the exercise of its discretion shall determine."[25] HRS chapter 560 "shall be liberally construed and applied to promote its underlying purpose and policies." HRS § 560:1–102 (1993). In addition, "[i]n any case in which [the family court] has jurisdiction, the court shall exercise general equity powers as authorized by law." HRS § 571–3 (1993).

Part and parcel of the family court's authority, in relevant part, are the following statutorily-conferred powers:

(2) Subpoena, summon, and compel the attendance of parties and witnesses from any part of the State, and compel the production of books, papers, documents including school, medical, and financial records, or tangible things;

(3) *Make and issue all orders and writs necessary or appropriate in aid of their original jurisdiction;*

. . . .

(6) *Enforce decrees and judgments and punish contempts according to law;*

. . . .

(8) Appoint guardians ad litem for minors or persons who are incompetent or attorneys to represent parties in accordance with law;

. . . .

(10) *Make and award judgments, decrees, orders, and mandates, issue executions and other processes, and do other acts and take other steps as may be necessary to carry into full effect the powers that are or shall be given to them by law or for the promotion of*

---

23. As earlier noted, Respondents waived the defense of insufficiency of service of process.

24. *See supra* note 7.

25. The predecessor statute to HRS § 560:5–107 (Supp.2005), HRS § 560:5–102 (1993) stated

that "[w]here protective and guardianship proceedings relating to the same person have been initiated, they may be consolidated in the court or in the family court as the court and the family court in the exercise of their discretion shall determine."

*justice in matters pending before them* [.]

HRS § 571–8.5 (Supp.2005) (emphases added). Moreover, under HRS § 560:1–302(b) (Supp.2005), "[t]he court has full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it."

A salutary purpose of a TRO is to preserve the status quo between the parties pending adjudication of the merits of a claim. *Cf. Wahba, LLC v. USRP (Don), LLC*, 106 Hawai'i 466, 472, 106 P.3d 1109, 1115 (2005) (noting that " '[a] TRO is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction' " (brackets omitted) (quoting *Whitman v. Hawai'ian Tug & Barge Corp.*, 27 F.Supp.2d 1225, 1228 (D.Haw.1998))); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994) (per curiam) (observing that preliminary injunctive relief is designed "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits").

Cynthia's arguments in support of a determination that the court had subject matter jurisdiction to issue a TRO are persuasive. First, she notes that the TRO petition was "necessary to prevent Duane's imminent removal of [Edith] from th[is] jurisdiction to Panama before the matters alleged in the [g]uardianship [p]etition ... could be determined by the ... court." Second, "the allegations of abuse heightened the need for immediate temporary injunctive relief, but were not the sole basis for the issuance of the TRO." As Cynthia submits, under the circumstances of the instant case, "the ... court validly exercised its powers pursuant to HRS chapters 560 and 571 to act in protection of a possible incompetent person and to preserve the status quo, pending a determination of [Edith's] capacity."

Third, as Cynthia suggests, it has generally been upheld that issuance of a temporary or permanent injunction enjoining removal of a person from a certain jurisdiction "is well-established" when "the effect of removal on the person's health, interests [or] welfare are called into question or are found not to be in the person's best interests[.]" *See, e.g., Zwernemann v. Kenny*, 236 N.J.Super. 37, 563 A.2d 1158, 1162 (1988) (upholding restriction against mother from moving child to another state as not in the best interest of child); *Scott v. Scott*, 74 R.I. 252, 60 A.2d 147 (1948) (affirming trial court's issuance of restraining order prohibiting mother from removing child from the court's jurisdiction until further order where child's welfare was called into question); *In re Estate of Lint*, 135 Wash.2d 518, 957 P.2d 755 (1998) (holding that the totality of circumstances, including, *inter alia*, the issuance of a TRO preventing removal of testator from court's jurisdictional reach, warrant trial court's decision that husband of testator exercised undue influence and acted fraudulently over testator).

The TRO at issue prohibited Edith from leaving or otherwise being removed from the United States until an IME could be performed in order to resolve the issue of her capacity. The court is empowered to issue "orders ... and ... [do] other acts ... as may be necessary to carry into full effect the powers that are or shall be given to them [under the guardianship statutes,]" HRS § 571–8.5(a)(10), and is authorized to "make orders ... and take all other action necessary and proper to administer justice in the matters which come before it[,]" HRS § 560:1–302(b). Accordingly, it cannot be concluded that the court was without jurisdiction to issue the TRO in this case where resolution of Edith's capacity is required to be resolved, and an apparent threat of Edith's removal from the court's jurisdiction was alleged. Hence, Respondents' contentions regarding the court's jurisdiction must be rejected.

## VI.

With respect to Respondents' point of error (2), regarding the alleged lack of evidence to issue the TRO, the court did not abuse its discretion in doing so. HFCR Rule 65(b) states that "[a] restraining order may be granted without notice to the adverse party

*when it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate relief to the applicant is appropriate.*" (Emphasis added.) As earlier noted, the court ruled on the propriety of issuing a TRO under HFCR Rule 65(b) in the following manner:

> Based upon the [TRO] Petition ..., the affidavits of ... Cynthia ... and others, and the opinion of Dr. ... Blanchette, and pursuant to [HFCR] Rule 65(b) ..., the [c]ourt finds there is *probable cause* [26] to believe that a past act or acts of mental or physical abuse against, or undue influence over, ... Edith ..., have occured[occurred], and that she may be at risk of being taken out of the country against her will or that she may lack capacity to make any decisions regarding her health care and domicile.

(Emphasis added.) Respondents contend that Cynthia "did not come close to meeting even [the] minimal standard [under HFCR Rule 65(b).]" They argue that

> no matter how one looks at it, what [Cynthia] proffered simply *does not add up to probable cause* "that a past act or acts of mental or physical abuse against, or undue influence over ... Edith ..., have occured[occurred], and that she may be at risk of being taken out of the country against her will or that she may lack capacity to make any decisions regarding her healthcare and domicile," all of which the court found in issuing the TRO.

(Emphasis in original.) In support of their contention, Respondents challenge the ad-

mission of the letter from Dr. Blanchette, attached to the TRO petition, arguing that it lacked proper foundation, and that there was "nothing in the record that showed who she was or what qualified her to give opinions." In addition, relying on *State v. Coffee*, 104 Hawai'i 193, 199, 86 P.3d 1002, 1008 (App. 2004), for the proposition that "[a] judge's personal familiarity with his prior decision in a different case does not warrant the taking of judicial notice of that prior decision solely in the interest of judicial efficiency[,]" Respondents maintain that the court's taking judicial notice of Dr. Blanchette's qualifications as a doctor who practices geriatric medicine, and her "training, reputation, and ... work in this field," based on her appearances in other cases before the court, was error.[27]

Petitioner responds that the court correctly considered Dr. Blanchette's letter because it was properly authenticated in the affidavit of Cynthia's Counsel. The affidavit identifies Dr. Blanchette as an M.D.(medical doctor) with an MPH (masters in public health)and was attached to the TRO Petition. Additionally, Petitioner argues that the memorandum in support of the TRO Petition, also signed by Cynthia's counsel, identifies Dr. Blanchette as the Professor and Chair of Geriatric Medicine, John A. Burns School of Medicine. Further, Petitioner argues that Respondents' reliance on *Coffee* is misplaced because, in that case, the district court took judicial notice to establish that (1) a police officer was a drug recognition expert (DRE) and (2) a certain test conducted by the police officer in order to determine drug

---

26. Although the court utilized a "probable cause" standard in determining whether a TRO should issue, HFCR Rule 65 does not prescribe such a standard. Respondents do not challenge the application of such a standard. We do not express any opinion as to the utilization of a "probable cause" standard in determining whether an ex parte TRO should be entered.

27. During proceedings before the court on December 17, 2003, the court made the following statement with respect to Dr. Blanchette's qualifications:

> THE COURT: Thank you. I'll make one statement again, and this is for the record so the record is clear. With regard to [Edith's counsel's] argument ... about the original

pleadings or unsupported allegations with regard to Dr. [Blanchette], although there was no curriculum vitae attached to the document that was her letter to the [c]ourt, the ... court is aware of her medical background, training and expertise.

> She's appeared numerous times in the family court by way of evidence, by letter, other reports being submitted, and it's the [c]ourt's understanding she's testified and been certified as an expert witness for, on a number of occasions, as well as in the probate court in the issue of geriatrics, in the field of geriatrics, so that doesn't deal with the question about order to show cause, but I did want the record to be clear that this [c]ourt's familiar with Dr. [Blanchette's] training, reputation and her work in this field.

impairment was scientifically valid. 104 Hawai'i at 194, 86 P.3d at 1003.

The reasoning in *Coffee* focused on whether the facts presented were the kind of facts permitted to be judicially noticed under HRE Rule 201, that is, whether they "were generally known within the territorial jurisdiction of the district court or capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned, as required for the taking of judicial notice." *Id.* at 200, 86 P.3d at 1009.

In the instant case, as stated *supra*, the first letter from Dr. Blanchette to Cynthia's counsel, appended to the TRO petition, identified the doctor as a doctor of medicine with an advanced degree in public health. The memorandum in support of the TRO Petition, signed by Cynthia's counsel, states that Dr. Blanchette is a professor and Chair of Geriatric Medicine at the John A. Burns School of Medicine. In view of her position at the only medical school in the State, it is arguable that Dr. Blanchette's status in geriatric medicine is "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned." *Id.*

█ However, the first letter aside, the TRO petition was supported by the affidavits of Cynthia,[28] Linda, and Beverley which, taken together, satisfy the mandate of Rule 65(b) that "specific facts ... by affidavit or by the verified complaint or cross-complaint" be shown to warrant immediate relief.

Cynthia's affidavit averred the following matters:

5. On or about June 1, 2003, my grandmother suffered a stroke.... Shortly thereafter, my father, Duane Carlsmith, who had been residing in Panama for several years, moved into her residence and prevented other family members from seeing her.

. . . .

8. My understanding is that my grandmother and my father are currently in the City and County of Honolulu, State of Hawai'i, but that my father intends to take her to Panama by ship. I tried to call and to visit her, but my father refused to let me talk to her or to see her.

9. My grandmother is legally blind and very frail. I am deeply concerned about my grandmother's health and welfare and believe that she is at tremendous risk at the hands of my father.

Linda's affidavit reported, in relevant part, as follows:

3. In July, Annaliese ... came to visit. Annaliese told me that the family would like me to become [Edith's] primary caregiver. They wanted to buy my contract from [my employer].

4. Shortly thereafter, they bought my contract and I became responsible for hiring, scheduling and purchasing groceries for the care of [Edith]. Additionally, I oversaw cleaning, laundry, and generally managing [Edith's] household.

5. I continued in that capacity until Wednesday, October 8, 2003. At that time, Duane took [Edith] to Hawai'i. I believe that they plan to stay in Hawai'i for three (3) weeks and then go to Panama where Duane has residence.

6. Duane plans to keep [Edith] in Panama.

7. During the time I was Ms. Carlsmith's primary home caregiver, I witnessed numerous instances of Duane keeping his mother isolated from other family members[.]

8. Duane went so far as to hook the telephone up to the computer so that only

---

28. Respondents object to the affidavits by Cynthia, Linda, and Beverley claiming that these were inadmissible because each of them "failed affirmatively to demonstrate that the affiant had personal knowledge of the matters addressed in the affidavit," as required by HRE Rule 602. As to Cynthia's affidavit, the allegation that she "tried to call and to visit" Edith but was refused by Duane, appears to be based on her personal knowledge, while the statement that she is "deeply concerned" about Edith's health does not establish a factual matter regarding Edith's health, but merely expresses her concern for Edith's well-being. With respect to the affidavits of Linda and Beverley, each of their affidavits both affirmatively state that the matters averred were based on "personal knowledge" and appear to indicate statements based on such knowledge. Hence, no error is discerned.

he could answer the or make telephone calls from the residence. No one was allowed to answer the door, except Duane.

. . . .

11. In mid September of 2003, one of the other health caregivers, Beverley, told me that [Edith] had bruises on her buttocks and upper inner thighs (near her groin). I then personally observed these bruises.

12. Duane canceled [Edith's] appointments with her speech therapist, physical therapist and message [sic] therapist. He told his mother in my presence he had done this ... until the bruises were gone.

. . . .

15. Duane did not take [Edith] to the doctor for her treatment of the bruises.

. . . .

18. [Edith] told me three (3) or four (4) times that she was horrified about leaving her residence and moving somewhere else.

19. On October 7, [Edith] told me, "I'm very terrified! They're taking me somewhere I don't want to go." This occurred while I accompanied Duane and [Edith] in my automobile to a shipping company in San Raphael, California.

Beverley's affidavit provided the following relevant statements:

7. During the approximately month and a half [sic] I was employed by Duane ..., I observed many things concerning Duane ... and his mother that caused me to be uneasy and of great concern regarding her emotional and physical welfare.

. . . .

10. On the morning of September 29 or 30, 2003, as I was assisting Edith in going to the toilet, at that time I noticed a large black and purple bruise on Edith's but-

tocks. (I cannot remember which side.) The bruise was approximately three inches in diameter. Upon closer observation, I also noticed that the inside of Edith's thighs, in the groin area, were red and chaffed. I had never noticed bruising or chaffing on Edith's body before. Edith had been complaining about frequent and severe muscle spasms in her legs at this time.

. . . .

13. Tuesday, September 30, 2003, I overheard Duane talking on the telephone. Duane said, "I think we're going to leave in a couple of days. Tomorrow we go to the bank and get $4000 or $40,000. I do not know who he was talking to. I told Linda abut this on Wednesday morning, October 1, 2003. She told me that Duane was taking Edith to Hawai'i and then to Panama (by ship) sometime in the future.

14. Approximately[ ] two weeks ago, Duane removed the telephone from Edith's bedroom. When she asked about where the phone was, Duane told her he had taken it out so that other members of the family wouldn't bother her. Edith told me that she did not want to go to Hawai'i, but it was what was best for her. Edith appeared to be very emotionally upset over having to leave her house.

■ As Cynthia contends, "the above-discussed affidavits satisfied the standard set forth in [HFCR] Rule 65(b)." The affidavits suggest that there was a possibility that Edith was receiving improper care from Duane, and that Duane would take Edith to Panama against her will. Given the possibility of irreparable injury, the court cannot be faulted for determining that immediate relief was appropriate.[29]

---

**29.** Ultimately, assuming, *arguendo,* admission of Dr. Blanchette's first letter was error, it was harmless error because it was supported by the doctor's subsequent February 23, 2004 affidavit with the second letter and CV appended. As her second letter states, she has "been an expert in Alzheimer's disease and other forms of dementia for the past 20 years. [She] has done research and published in peer review journals on this topic. [She] is considered a national expert on the subject and has been affirmed as an expert in competence in both federal and state court."

Dr. Blanchette's CV indicates she attended medical school at Dartmouth University, did a two year fellowship in geriatric medicine at Harvard University, and she is currently a Professor and Chair of the Department of Geriatric Medicine at the John A. Burns School of Medicine at the University of Hawai'i and was the founding director of the Geriatric Medicine program at the University of Hawai'i.

Regarding the erroneous admission of evidence by a trial court, this court has said that "the error is not to be viewed in isolation and

Hence, HFCR Rule 65(b) being satisfied, sufficient evidence existed to support the issuance of the TRO, and, thus, the court did not abuse its discretion on this matter.

## VII.

In their point of error no. 3, Respondents contend that the appointment of a TGAL should have been terminated following Edith's appearance before the court on October 28, 2003, when she denied the allegations of the guardianship petition. In support of this contention, Respondents rely on the holding of the Supreme Court of the Territory of Hawai'i in *Kalanianaole v. Liliuokalani*, 23 Haw. 457, 468–70 (1916), which states as follows:

> The law presumes all persons to be of sound mind, and if adults, capable of managing their own affairs; and the mere fact that it is alleged by a person styling himself next friend, that a particular individual, who is an adult, is of weak or unsound mind, and not capable of taking care of his own affairs, does not destroy that presumption. But where the action is brought in the name of the person alleged to be of weak or unsound mind, by his next friend, against parties having an interest in the subject-matter, it is to be presumed, in the absence of anything appearing to the contrary, that whatever consent such person is capable of giving to the bringing of the action has been obtained; and that it is in fact his suit, for it is really in his name; and that he has obtained the consent of a friend, as the most competent person by whom he wishes his case to be conducted, in order that his rights may be the better protected. *But if he makes known to the court that it is not his suit; that he is competent to take care of his own affairs; that the supposed friend is in fact an intermeddler, the court in such a state of* case is presented with the question: *What is the proper course to pursue?*
>
> . . . .
>
> *... Doubtless an ex parte allegation of insanity or mental incompetence, or of mental weakness and undue influence destroying free agency, would warrant a court in appointing a next friend or guardian ad litem. But such would not be the case where, at the time of the purported appointment, the party in question has placed before the court a denial of such incompetency, nor would it justify the court in continuing an appointment previously made after such denial has been interposed, except upon adjudication of the fact of incompetency after a judicial inquiry.* It would present an intolerable situation that a party litigant should be represented by a next friend or a guardian ad litem on the theory that he is incompetent, and also by an attorney of his own selection on the theory that he is competent, each representative filing inconsistent pleadings and insisting on conducting the case as he should deem best. Upon principle there would seem to be no room for the theory that the trial judge has the discretion to decide the issue as to the party's competency in connection with the merits of the case for the question would not down [sic] as to which of the representatives should be allowed to frame the issues and conduct the case or discontinue it. *If the party be in fact competent he is entitled under the law to appear in person or through a representative of his own choice, and if he be in fact incompetent his only representative should be the appointee of the court.*

(Emphases added.) (Citation and internal quotation marks omitted.) Respondents argue that instead of terminating the appointment of a TGAL, the court reauthorized a TGAL in its November 26, 2003 order.[30]

---

considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled." *State v. Machado*, 109 Hawai'i 445, 452, 127 P.3d 941, 948 (2006). Thus, viewed in light of the doctor's subsequent affidavit and CV, error if any in the admission of the first letter was harmless error.

30. The November 26, 2003 order instructed Luria to continue in the capacity of TGAL for Edith. That order provided that Edith may return to her home in California or travel to another location in the United States if she informs the TGAL of her itinerary, address, and telephone number beforehand. It also authorized the TGAL to, *inter alia*, (1) "arrange for appropriate access for family members to [Edith,]" (2) arrange for an

*Kalanianaole* is distinguishable and must be viewed in context. *Kalanianaole* does not stand for the proposition that in all cases where the individual denies his or her incapacity, the appointment of a TGAL should end. In *Kalanianaole,* the petitioner questioned the mental competency of Queen Liliuokalani (the Queen) before the trial court and alleged, in purported behalf of the Queen, that two of the respondents conspired and exercised undue influence over the Queen causing her to execute a deed of trust which named the two respondents, among others, as beneficiaries. 23 Haw. at 458–59. The petitioner sought the annulment of the deed and all related instruments, and requested that the trustees be ordered to reconvey and deliver the subject property to the Queen. *Id.* at 458. The Queen, through counsel, moved to dismiss petitioner's claim on the ground that the petitioner's complaint was filed without her authority, consent or knowledge. *Id.*

The trial court denied the Queen's motion to dismiss and reasoned that it regarded the Queen's affidavit in support of her motion to dismiss as an objection to the designation of the petitioner as her next of friend. *Id.* at 459. The court appointed an attorney as next of friend for the Queen in place of petitioner. *Id.* Subsequently, the Queen filed an affidavit asserting her capacity, accompanied by a notice to petitioner's counsel that she would be requesting a hearing to determine the issue of her competency. *Id.* at 459–60. Later, the Queen filed an "Objection and Protest" against further proceedings until after her competency had been judicially determined. *Id.* at 460–61. However, the trial court ruled that it would not decide the issue of the Queen's competency as a preliminary matter but would do so in relation to the other issues brought before it. *Id.* at 461.

On appeal, the issue presented before the Territorial Supreme Court, among others, was whether it was proper for the trial court to adjudicate the merits of the case prior to a determination of the Queen's mental compe-

tency. *Id.* at 468. The Territorial Supreme Court held that "when in any case the alleged incompetency is denied by the alleged incompetent the court must hear and determine the issue *in limine* and before further steps be taken in the cause." *Id.* at 470. It explained the effect of the trial court's error as follows:

> Here, the error was emphasized by the fact that the circuit judge, while expressly declining to make a finding as to the Queen's present status or condition, permitted the guardian ad litem, who could have standing in court only in case the Queen be in fact incompetent, to file an answer and cross bill averring her incapacity, the legal effect of which was to supplant her former assertion of competency.

*Id.*

Thus, as Cynthia contends in her answering brief, *Kalanianaole* disapproved of the trial court permitting the GAL to take legal action on the Queen's behalf before it determined that she was not competent to proceed on her own. In this case, the purpose of the guardianship proceeding was to determine whether Edith was competent to make decisions regarding her health care and other matters affecting her. Following the October 28, 2003 hearing, the court determined that an IME was required to be performed, and in the interim, the continuance of a TGAL was necessary.

Therefore, *Kalanianaole* does not aid Respondents' cause. *Kalanianaole* stands for the proposition that when an allegedly incapacitated person denies his or her incapacity, then the issue of capacity must be resolved prior to a determination on the merits. In fact, the court's decision to appoint a TGAL and order an IME is consistent with *Kalanianaole* in that the court did not proceed to finally adjudicate the issue of whether guardianship of Edith should be established. Instead, the court ordered that the matter of Edith's capacity be resolved prior to any determination regarding whether the guardianship matter should proceed.

IME, (3) provide a list of proposed examining physicians able to perform the IME, and (4) have continued access to Edith, "her medical provid-

ers and caretakers[,] and such records and documents as shall be necessary to perform his duties as [TGAL]."

The court's decision to retain a TGAL while the issue of Edith's capacity remains undecided is also supported by HRS § 560:5–303(b) (1993) which provides in pertinent part that "[u]pon the filing of the petition, the family court shall set a date for hearing on the issues of incapacity and, if at any time in the proceeding, the court determines that the interests of the allegedly incapacitated person are or may be inadequately represented, it shall appoint a guardian ad litem."

As earlier mentioned, HRS chapter 560 "shall be liberally construed and applied to promote its underlying purpose and policies." HRS § 560:1–102. "The court has full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it." HRS § 560:1–302(b). In that light, we hold that the court did not err in maintaining the appointment of the TGAL in view of the allegations of potential abuse and undue influence, as part of its continuing duty to protect the interest of Edith before the issues of her capacity are resolved.

### VIII.

We next address Respondents' point of error no. 6, and their objections to the following findings and conclusions issued on December 22, 2005, which we reiterate here:

A. *FINDINGS OF FACT*

. . . .

5. ... [Edith's counsel] stated that [Edith] had received a copy of the TRO and represented to the [c]ourt that he had read the [g]uardianship petition and TRO to [Edith].

. . . .

9. On October 29, 2003, ... [Cynthia's counsel] served file-marked copies of the [Guardianship Petition], TRO Motion, and Ex Parte Petitions to Shorten Time upon [Duane] ... through ... [Edith's counsel].

. . . .

12. At about the time that she was released from Queen's Hospital, [Edith] was oriented to her name only. [Edith] did not know where she was, nor could she recall the day, date, or time.

13. On or about November 24, 2003, Duane and [Edith] went to Panama in violation of the TRO.

. . . .

B. *CONCLUSIONS OF LAW*

1. This court has jurisdiction to hear the [guardianship petition].

. . . .

9. [Edith] violated the TRO entered on October 24, 2003 by leaving for Panama prior to completion of an IME. Duane assisted [Edith] in violating the TRO. [Edith] and Duane violated the First and Second IME Orders.

10. Based on the violations of the [c]ourt's [o]rders of October 24, 2003, and November 26, 2003, and the noncompliance with IME orders, [Edith] and Duane were precluded from presenting evidence of [Edith]'s capacity.

11. Based on the evidence that was before the [c]ourt, the [c]ourt finds [Edith is] incapacitated and in need of a guardian to provide her continuing care.

In sum, we cannot discern any error on the part of the court with respect to the challenged findings and conclusions. We further note that, in light of the circumstances regarding the issuance of these findings and conclusions, and consistent with HFCR Rule 37(b)(2)(A), *see supra* note 2, the court was empowered to enter "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established," where a party fails to comply with an order.

### A.

With respect to the court's December 22, 2005 finding no. 5, Respondents identified in the record where Edith objected to this finding but offered no argument as to why this was in error. As we have previously stated, "This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." *Lanai Co. v. Land Use Com'n*, 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004); *see also Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509, 519 n. 14 (2004) (explaining that an appellate court is not required to

sift through the voluminous record for documentation of a party's contentions). Accordingly, we need not reach this contention.

## B.

With respect to finding no. 9, Respondents simply state that they "find no proof of service in the record." As discussed *supra* however, Respondents waived the defenses of lack of service or insufficient service. Hence, any error as to the lack of proof of service has been likewise waived.

## C.

■ Finding no. 12 is also not clearly erroneous. Respondents contend that "no substantial evidence supports the finding" that "[a]t about the time she was released from Queen's Hospital, [Edith] did not know where she was, nor could she recall the day, date, or time." However, Respondents proffer no arguments beyond that contention. We note, however, that the court's finding is supported by the affidavits and medical records. To reiterate, Edith's medical records include a progress report dated November 13, 2003, or a day prior to Edith's discharge, it was reported that Edith's condition was "A & Ox1." Dr. Blanchette explained in her second letter that this meant Edith was "alert oriented only to person, place, *or* time." (Emphasis in original.)

In that same letter, Dr. Blanchette assessed that, based on her review of Edith's medical records, "[t]his record provides strong evidence of a physically frail, mentally incapacitated person whose 'baseline' is seriously impaired to the point that she simply knows who she is, does not recognize others even when informed of who they are, and is not oriented to day, date, month, or year." Hence, substantial evidence exists to support the court's finding no. 12, and therefore, the court did not clearly err in determining Edith "did not know where she was, nor could she recall the day, date, or time."

## D.

Similarly, the court did not err in finding no. 13 that "[o]n or about November 24, 2003, Duane and [Edith] went to Panama in violation of the TRO." In connection with this argument, Respondents also claim that conclusion no. 9, determining that Edith and Duane violated the TRO, was in error. According to Respondents, "Edith and Duane raised the issue that the TRO was void, and therefore was not violated." As earlier determined, Respondents' contentions regarding the validity of the TRO are unpersuasive. Accordingly, the court's finding no. 13 and conclusion no. 9 need not be disturbed.

## E.

Respondents claim that conclusion no. 1 is incorrect, but provide no arguments in this respect. However, as earlier discussed, Respondents' arguments relating to the court's jurisdiction, either over the persons of Edith and Duane or with respect to the issuance of a TRO in relation to a guardianship petition, are not tenable. Therefore, conclusion no. 1 is not wrong.

## F.

With respect to the court's conclusion no. 10, no arguments are presented. Therefore, Respondents waived error in this respect. *See* HRAP Rule 28(b)(7) (2006) ("Points not argued may be deemed waived.")

## G.

With respect to the court's conclusion no. 11, that "[b]ased on the evidence that was before the [c]ourt, the [c]ourt finds [Edith is] incapacitated and in need of a guardian to provide for her continuing care[,]" we hold that no reversible error is present. Respondents argue that "no substantial evidence supports the [c]ourt's finding that Edith is 'incapacitated and in need of a guardian.' " As earlier discussed, the court entered its December 22, 2005 findings, conclusions, and order in response to Cynthia's motion for attorney's fees and sanctions against Edith and Duane. Although the parties presented evidence with respect to Edith's capacity, the issue of Edith's capacity has not been finally decided.

The court is empowered to enter, as a sanction against a party who fails to comply

with a discovery order, "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established." HFCR Rule 37(b)(2)(A). Respondents do retain the opportunity to rebut the court's interim ruling that Edith is incapacitated. In fact, the court's December 22, 2005 order permits such opportunity by ordering that "Duane ... and Edith ... [be] precluded from presenting evidence to establish [Edith]'s alleged capacity *until such a time as she submits to an [IME]*." (Emphasis added.)

We recognize that, on its face, the court's conclusion may be read as indicating that the matter of Edith's capacity has been fully adjudicated. However, in light of the court's order allowing Duane and Edith to establish Edith's capacity following her submission to an IME, this is not the case. Hence, to the extent that conclusion no. 11 was made as part of the order sanctioning Respondents for failing to comply with the IME orders, and in light of the court's authority to enter "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established" under HFCR Rule 37(b)(2)(A), the court did not err.

### IX.

Finally, with respect to Respondents' objection to the court's November 26, 2003 finding no. 4 that Edith "was served with the [guardianship petition] through her Hawai'i attorney's[,]" Respondents offer no argument in support of this contention. However, it appears that Respondents are reiterating their objections to the manner in which Edith was served. As earlier indicated, *supra,* Respondents have waived their objections for insufficiency of service by failing to raise objections regarding service in a timely manner or by motion pursuant to HFCR Rule 12. Hence, no clear error exists with respect to the court's November 26, 2003 finding no. 4.

### X.

Accordingly, we affirm the court's September 26, 2005 order granting in part and denying in part Cynthia's motion for attorney's fees and sanctions and its September 26, 2005 judgment, and remand this case to the court for further proceedings consistent with this opinion.

