210 P.3d 501

Cedric C. WILLIAMS,
Respondent/Petitioner–Appellee

v.

Robert AONA, Petitioner/Respondent–
Appellant.

No. 28691.

Supreme Court of Hawai'i.

June 19, 2009.

Frederick W. Rohlfing and Michael G. Kozak (of Case Lombardi & Pettit), Honolulu, for petitioner/respondent-appellant.

Cedric C. Williams respondent/petitioner-appellee, pro se.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge CHANG, Assigned by Reason of Vacancy.

Opinion of the Court by DUFFY, J.

Petitioner/Respondent–Appellant Robert Aona (Aona) filed a timely Application for Writ of Certiorari (Application) urging this court to review the December 30, 2008 judgment of the Intermediate Court of Appeals (ICA) based on its Memorandum Opinion in *Williams v. Aona,* No. 28691, 2008 WL 5182933 (App. Dec. 10, 2008). The ICA's Memorandum Opinion affirmed the district court of the first circuit's[1] (district court) July 17, 2007 Order Granting Petition for Injunction Against Harassment (injunction order).

In his Application, Aona argues that the ICA gravely erred in affirming the injunction order because:

(1) "The ICA incorrectly held that the district court had jurisdiction over Williams's Petition [for a temporary restraining order and injunction against harassment]."

(2) "The ICA incorrectly affirmed the district court's injunction imposing a distance restriction on Aona while in the workplace."

(3) "The ICA incorrectly affirmed the district court's refusal to admit and consider evidence of William's prior criminal conviction."

(4) "The ICA incorrectly affirmed the district court's refusal to admit and consider evidence of the [Department of Environmental Services] workplace rules."

We accepted the Application for the limited purpose of correcting an error by the ICA when it affirmed the district court's jurisdiction on the basis of the doctrine of preemption. We agree with the ICA's Memorandum Opinion in all other respects.

## I. BACKGROUND

Aona and Cedric Williams (Williams) are both employees of the City and County of Honolulu (City and County) Department of Environmental Services (DES), Honolulu Yard. Aona works for DES as a "refuse collection supervisor." Aona's duties include "conducting periodic" post-checks on refuse vehicles, "like snap inspections." A post-check is an examination of the refuse truck that occurs at the end of a shift. During a post-check, the driver is responsible for examining certain parts of the truck including the lights, tires, rims, and frame. Conducting periodic post-checks is "not a set duty." Instead, it is rotated among various supervisors.

Williams works for DES as a "crew leader." A crew leader is responsible for driving the refuse vehicle. After his shift, Williams is responsible for conducting a post-check on his refuse vehicle.

### A. *Petition for Temporary Restraining Order (TRO)*

On July 3, 2007, Williams filed a petition for Ex Parte Temporary Restraining Order and for Injunction Against Harassment (petition) against Aona. The petition was based on "[r]ecent or past act(s) of harassment." Williams explained that:

Saturday June 30, 2007 at approximately 11:55 A.M. Robert Aona palmed me on my left sided chest area causing an immediate sharp pain that required emergency medical treatment at Straub clinic and hospital. I was diagnosed with a bruised chest. As-

---

1. The Honorable Gerald H. Kibe presided.

sault occurred at Honolulu Refuse Collection Yard located at 626 Middle Street, Honolulu, HI 96819. Police Report was filed and superintendent and refuse collection administrator was notified. When I questioned Robert Aona as to why he did this to me he responded that I am a foolish boy. I feel that this may be a racial term and he may dislike me due to my race of being African American. I have notified refuse collection administrator that Robert Aona is causing me psychological stress due to the fact that he is a larger man than I am, he may not like my race and I fear he may attack me and cause me much more severe bodily and psychological harm than he already has. I feel severely threatened by Robert Aona due to his excessive size. He causes me anxiety when I see him.

### B. District Court Proceedings

On July 17, 2007, a hearing was held in district court.

### 1. Williams's testimony

Williams testified that on June 30, 2007, after he brought his refuse truck back to the refuse yard, Aona was the supervisor in charge who supervised Williams's post-check of his truck. According to Williams, Aona first helped him check the lights on the truck and then

> I parked the truck, got out and then [Aona] stepped back [and] said start from wherever you want. So I started from the front tires, check the lugs, check the rim, going down, check the frame, going down. I was driving the bulky truck that day. That's two back tires, so there's four on one side, so I'm checking those tires, the rims, check the last tire.
>
> . . . .
>
> As I was going around the truck, he stopped me, ["]start again, now explain to me what you doing,["] and then I said, ["]what?["] And then I said, ["]you know what, you just gotta write me up because I'm not gonna do a post-check with you[."]

Williams testified that he did not think that it was unusual that Aona was conducting a post-check; rather "[j]ust the way he wanted

me to do it, to start all over and explain to him what I'm doing. That's not right."

After Williams disobeyed Aona's instructions, he stated that,

> I went walk to the truck to get my bag, he pushed the door shut. So, I tried to open [it] again, then right there, he palmed me on the chest and said ["]you nothing but a foolish boy,["] and I tole(sic) 'em, ["]what's up with that, you hit me and you calling me names.["]

Williams testified that after Aona palmed him, he felt "a sharp pain" in his chest and noticed "a mark" on his chest. Williams called his union steward and then called the police. Williams completed a police report and informed the police that he wanted to press charges against Aona. The police asked if Williams wanted them to call an ambulance, but Williams told them that he would go to the hospital on his own. Williams had his girlfriend drop him off at the hospital. He was diagnosed with a bruise on his chest and prescribed pain pills.

### 2. Aona's testimony

On June 30, 2007, Aona testified that he was the supervisor on duty who supervised Williams's post-check of his refuse vehicle. Aona stated that he was dissatisfied with Williams's post-check because Williams had skipped several steps. Aona eventually told Williams "you missed a whole lot . . . [s]o let's go back and start where we left off and work our way back here," but Williams "totally ignored" Aona. Then, Aona said, "I think I'm gonna have to ask you to tell me what you doing because that way, I'll know you're doing it." According to Aona,

> [Williams] starts saying, ["]I doing my post-check, I doing my post-check["] . . . and all he's doing is playing with the lug nuts on the back tire.
>
> So I said, ["][Williams], you're forcing me to do this. I'm giving you a direct order, let's go back to the front, start over and do the post-check properly like you were taught,["] and then he stands up and

he goes ["]you cannot tell me what to do,["] ... [because] I am not his supervisor.

After that, Aona testified that he

said ["]yes,["] I can and will require you to do this. I walked right here and [Williams] was standing there looking at me kind of belligerently like, ["]you cannot.["]

. . . .

So I said ["]well, I'll just wait, you know. So, I waited, I don't know, less than a minute, you know, seconds, and he hadn't moved, so I told him ... ["]let's start here,["] and he still doesn't move, so I said ["]can we do the post-check now?["]

At this point, he rushed up to me and he was, he had a glowering look on his face, he had his dark shades and he's puffing himself up and trying to be intimidating.

. . . .

When he came ... too close for my personal space, I put my hand on his shoulder and went ["]stop, stop," ... [w]e're in that position for five seconds, and I'm thinking to myself, okay, great, situation resolved, we're gonna start the post-check.

When he starts, he takes a step back and goes ["]you wen touch me, you wen touch me,["] and his voice is getting louder, literally shouting and he starts hopping around in that area ... [s]o, I backed up to the front of the truck ... I believe this is the time he whipped out his cell phone and I thought that was a good idea, so I whipped out my cell phone and I called the base yard office.... I'm turned away from him and I'm shaking my head, oh, this is a foolish move.

He stops his dancing and comes up to me again and goes ["]what you wen call me["] screaming, but he's not really, he still maintain [sic] safe enough space from me, but he's screaming at me, ["]what you wen call me, what you wen call me.["] I told 'em, ["][Williams], I didn't call you anything.["] This is when he brings his face so close to my face.... I'm taller than him, but he's trying, you know, do the face, body push and he's pushing me, and

then I told 'em, ["]back up,["] you know, and he didn't back up.

. . . .

[T]his is when I put my hand on [him] ... and I told 'em, ["]back up,["] he didn't back up.

. . . .

So, he finally backed up just a little bit, but it was enough for me that I disengaged and I walked far away, maybe ten feet in front of the vehicle, and at this time too, he had kine'a [sic] backed up to halfway in the body of the truck and ... my phone had gotten flipped off at this time, so I called again [sic] immediately acting supervisor[.]

After Aona called the supervisor and asked him to come to the yard, Aona claims that he "turn[ed] around and receive [sic] three forearm smashes into [his] sternum ... from [Williams's] right forearm and it stunned [him], it rocked [his] head back." [2] Aona stated that two superintendents were "in sight" and Williams "immediately backed off." However, according to Aona, neither superintendent witnessed Williams's alleged attack on Aona.

Soon after, the police arrived. Aona claims that he voluntarily gave a statement to police detailing Williams's alleged attack on him.

Aona also testified that, at the end of the day, he drove to the Kaiser urgent care clinic where he "was seen and treated for soft tissue damage." He stated that "I was prescribed ice, ice regime, pain killer, and it was suggested that I have follow-up on gentle massage and was suggested that I have follow-up visits and perhaps even counseling for any post-stress that I might have suffered from being attacked."

Aona denied "striking Williams with an open palm or otherwise in his chest area[.]"

### 3. The District Court's Discussion With Deputy Corporation Counsel About Workplace Management

Also present at the hearing was Deputy Corporation Counsel Gary Takeuchi (Takeu-

---

**2.** When questioned by the district court, Aona testified that Williams hit him with his left forearm, because he still had his phone in his right hand.

chi) representing the employer, the City and County. Takeuchi stated that "we do have an agreement of the parties that in the injunction that might issue in this case, we would not include the place of employment, that the parties are confident that the employer can work out arrangements." Takeuchi also stated that "the supervisory people that I spoke to strongly believe that they can manage the worksite so there won't be issues ... whatever geographical standard might be imposed would be difficult to maintain at the work location."

C. *The District Court's Order Granting Williams's Petition for Injunction*

The district court granted Williams's petition and filed the Order Granting Petition for Injunction Against Harassment against Aona. The district court found that Williams was more credible than Aona:

THE COURT: I have considered the evidence that has been presented during the course of this hearing. I have considered all factual issues by the clear and convincing standard, and I have made determinations on issues of credibility and, indeed, this case turns on questions of credibility between Mr. Williams and Mr. Aona because there are no other percipient witnesses to what happened between the two gentlemen on June 30, 2007, at just before noon at the Honolulu Refuse Division Facility on Middle Street.

Now, I have had during the course of this long hearing an opportunity to watch both sides while they were making their statements. I've thus been able observe their demeanor, behavior, listened to what they have said, how they have said it, facial expressions, body language, those kinds of things, and those all contribute to my ability to render a determination on the issue of credibility.

Now, one thing I do note as reflected by my question to Mr. Aona is that during the course of his testimony, he did reference touching Mr. Williams not once, but two times in his initial testimony. Now, he endeavored to correct that in response to my questions by indicating that it was during the first time that there was any hint of any trouble that Mr. Aona said that Mr. Williams approached Mr. Aona that Mr. Aona put out his hand to maintain some distance with Mr. Williams and thus kept his hand, right hand on Mr. Williams's left shoulder for some time.

But then, and it was during this morning's session, Mr. Williams indicated that, excuse me, Mr. Aona said that there was a further time when Mr. Williams came forward, got close again to him, Mr. Aona said that he put his hand on Mr. Williams'[s] shoulder just like was demonstrated earlier, and to me, that's an inconsistency in terms of what Mr. Aona says happened. It's, it was something that I took note of at that point and questioned Mr. Aona about it, but I don't feel comfortable in the way that Mr. Aona responded.

And further, in the way in which Mr. Aona again proceeded with his testimony in comparison to the very clear and firm testimony, very straightforward testimony of Mr. Williams, all of this leads me to conclude that Mr. Williams'[s] version of events is more credible than that of Mr. Aona.

As a result, the court found that Williams had established by clear and convincing evidence that Aona had harassed him according to the definition in Hawai'i Revised Statutes (HRS) § 604–10.5(a)(1) (1993 & Supp.2008) and that a temporary restraining order was warranted.[3]

**3.** HRS § 604–10.5 grants the district court the power to enjoin and temporarily restrain harassment. It states, in relevant part:
"Harassment" means:
(1) Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault[.]
....
(b) The district courts shall have power to enjoin or prohibit or temporarily restrain harassment.

(c) Any person who has been subjected to harassment may petition the district court of the district in which the petitioner resides for a temporary restraining order and an injunction from further harassment.
(d) A petition for relief from harassment shall be in writing and shall allege that a past act or acts of harassment may have occurred, or that threats of harassment make it probable that acts of harassment may be imminent; and

The order required Aona to not intentionally be within fifteen feet away of Williams at any time for three years. There was no separate distance requirement for the work site.

## D. *ICA's Memorandum Opinion*

The ICA affirmed the district court's Order Granting Petition for Injunction Against Harassment. *Williams*, 2008 WL 5182933, at *10.

## II. *STANDARDS OF REVIEW*

### A. *Jurisdiction*

Whether the district court had jurisdiction over Williams's petition "presents a question of law, reviewable de novo." *See Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 90, 148 P.3d 1179, 1192 (2006).

### B. *The Issuance of a TRO*

With respect to the issuance of a TRO, a relief in equity, the relief granted by a court in equity is discretionary and will not be overturned on review unless the court abused its discretion.... A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.

*In re Guardianship of Carlsmith*, 113 Hawai'i 211, 223, 151 P.3d 692, 704 (2006) (internal quotation marks, citations, brackets, and ellipses in original omitted).

## III. *DISCUSSION*

The central issue in this Application is whether the district court properly exercised

jurisdiction over Williams's petition or whether Williams was first required to exhaust his contractual remedies under the collective bargaining agreement (CBA) between the City and County and United Public Workers AFSCME, Local 646, AFL–CIO. Aona correctly claims that the ICA erred when it affirmed the district court's jurisdiction on the basis of the doctrine of preemption. However, we hold that the district court properly exercised jurisdiction over Williams's petition for the reasons discussed below.

### A. *The District Court Properly Exercised Jurisdiction Over Williams's Petition for an Ex Parte Temporary Restraining Order and For Injunction Against Harassment.*

In addition to filing the petition for a TRO, Williams filed a grievance against Aona with the City and County in the form of a "workplace violence incident report." At the hearing, the district court asked Aona if he wanted to make a motion to postpone the hearing until after any "personnel action" was taken. Aona chose to proceed with the hearing.

On appeal to the ICA, Aona argued that the district court did not have subject-matter jurisdiction over Williams's petition because the conduct Williams complained of was an employment matter. According to Aona, employment matters were governed by the CBA and Williams had not exhausted his administrative remedies under the CBA. Aona claimed that:

> In his petition for a TRO and injunction, Williams essentially makes the complaint his employer, DES, violated section 46.02a of the CBA, which requires DES to pro-

shall be accompanied by an affidavit made under oath or statement made under penalty of perjury stating the specific facts and circumstances from which relief is sought.

....

(f)

....

[]The parties named in the petition may file or give oral responses explaining, excusing, justifying, or denying the alleged act or acts of harassment. The court shall receive all evidence that is relevant at the hearing, and may make independent inquiry.

[]If the court finds by clear and convincing evidence that harassment as defined in paragraph (1) of that definition exists, it may enjoin for no more than three years further harassment of the petitioner, or that harassment as defined in paragraph (2) of that definition exists, it shall enjoin for no more than three years further harassment of the petitioner; provided that this paragraph shall not prohibit the court from issuing other injunctions against the named parties even if the time to which the injunction applies exceeds a total of three years.

HRS § 604–10.5(a)(1), (b)-(d), (f).

vide a violence-free workplace by providing the means and methods to prevent the risk of violence to employees, such [as] Williams. Under the CBA, however, Williams was required to resolve that complaint pursuant to the grievance procedure set forth in section 15 of the CBA.

In other words, Aona argued that Williams should have waited for the results of the workplace investigation into the grievance he filed against Aona before filing his petition with the district court.

The ICA concluded that the district court had subject matter jurisdiction over the hearing. The ICA stated that "preemption of state court jurisdiction [by a contract grievance provision in a collective bargaining agreement] is not unlimited under the National Labor Relations Act (NLRA) or Hawai'i policy." *Williams*, 2008 WL 5182933, at *4. Specifically, the ICA concluded that Williams's interest in protection from "outrageous conduct, threats, intimidation, and words" was "not diminished or preempted because it is related to matters contained in a CBA grievance process." *Id.* The ICA further concluded that "Aona failed to demonstrate that a written remedy was available under the CBA grievance procedure that could protect Williams from future harassment. Because Aona did not demonstrate that the CBA provides a reasonable alternative to an injunction order, the presumed goal of such a policy is not applicable." *Id.* (footnote omitted).

In his Application, Aona argues that the ICA erred when it concluded that the district court had jurisdiction over Williams's petition because "the ICA erroneously confused the doctrines of preemption and exhaustion, failed to conduct any analysis of the exhaustion issue, and erroneously concluded that the CBA provides no remedy to Williams."

Although Aona is correct in his assertion that the ICA erred in its reliance on the doctrine of preemption, the district court had jurisdiction over Williams's petition based upon the following analysis.

## 1. Subject–Matter Jurisdiction

■ Aona failed to raise the exhaustion of remedies issue in the district court. "As a

general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003).

■ However, Aona argues that Williams's failure to exhaust his administrative remedies deprived the district court of subject-matter jurisdiction. As we have stated,

[i]t is well-established ... that lack of subject matter jurisdiction can never be waived by any party at any time. *In re Application of Rice*, 68 Haw. 334, 713 P.2d 426 (1986). In setting forth the absolute necessity that a court possess subject matter jurisdiction, this court ruled:

"The lack of jurisdiction over the subject matter cannot be waived by the parties." If the parties do not raise the issue, "a court *sua sponte* will, for unless jurisdiction of the court over the subject matter exists, any judgment rendered is invalid." (Citing *Meyer v. Territory*, 36 Haw. 75, 78 (1942))

*Id.* 68 Haw. at 335, 713 P.2d at 427. Moreover, "[s]uch a question is in order at any stage of the case, and though a lower court is found to have lacked jurisdiction, we have jurisdiction here on appeal, not of the merits, but for the purpose of correcting an error in jurisdiction." *Id.*

*Chun v. Employees' Ret. Sys.*, 73 Haw. 9, 13, 828 P.2d 260, 263 (1992); *see also, e.g.*, 48B Am.Jur.2d *Labor and Labor Relations* § 2428 (2005) ("A claim that the defendants should have raised plaintiffs' alleged failure to exhaust contractual remedies in their answer and waived it by failing to do so was rejected, since the failure to exhaust goes to the court's subject-matter jurisdiction and can be raised at any time by any party or by the court under Fed.R.Civ.P. 12(h)(3).") (citation omitted). Thus, if the district court did not have jurisdiction over Williams's petition, then its order must be vacated despite Aona's previous failure to raise the issue. *See Lingle v. Hawaii Gov't Employees Ass'n, AFSCME, Local 152, AFL–CIO*, 107 Hawai'i 178, 182, 111 P.3d 587, 591 (2005) ("A judg-

ment rendered by a circuit court without subject matter jurisdiction is void." (citation omitted)).

### a. *exhaustion of remedies in general*

■ Aona argues that the district court did not have jurisdiction over William's petition because he did not exhaust his remedies under the CBA. Exhaustion of remedies is defined as "[t]he doctrine that, if an administrative remedy is provided by statute, a claimant must seek relief first from the administrative body before judicial relief is available." *Black's Law Dictionary* 613 (8th ed.2004). In general, the doctrine of exhaustion of remedies is a policy of judicial economy. *See generally* 2 Am.Jur.2d *Administrative Law* § 474 ("The exhaustion rule serves a legitimate state interest in requiring parties to exhaust administrative remedies before proceeding to court, thereby preventing an overworked court from considering issues and remedies that were available through administrative channels."). As such, the doctrine of exhaustion of remedies *temporarily* divests a court of jurisdiction.

### b. *exhaustion of remedies under a CBA*

■ Aona is correct that when parties are bound by the terms of a CBA, we have repeatedly identified a policy interest in requiring employees to exhaust their contractual remedies before bringing judicial claims against an employer:

> It is well-settled that an employee must exhaust any grievance or arbitration procedures provided under a collective bargaining agreement before bringing a court action *pursuant to the agreement.* Strong policy considerations support this rule. The exhaustion requirement, first, preserves the integrity and autonomy of the collective bargaining process, allowing the parties to develop their own uniform mechanism of dispute resolution. It also promotes judicial efficiency by encouraging the orderly and less time-consuming settlement of disputes through alternative means.

*Hokama v. University of Hawai'i*, 92 Hawai'i 268, 272, 990 P.2d 1150, 1154 (1999) (footnote omitted) (internal citations omitted) (emphasis added). Indeed, "where the terms of public employment are covered by a collective bargaining agreement pursuant to HRS Chapter 89 and the agreement includes a grievance procedure to dispose of employee grievances against the public employer, an aggrieved employee is bound by the terms of the agreement." *Winslow v. State*, 2 Haw. App. 50, 55, 625 P.2d 1046, 1050 (1981). Applying the exhaustion doctrine to the terms of a CBA "is in keeping with prevailing National Labor Relations policy and Hawaii policy favoring arbitration as a dispute settlement mechanism." *Santos v. State, Dept. of Transp., Kauai Div.*, 64 Haw. 648, 655, 646 P.2d 962, 967 (1982) (per curiam). However, "[g]rievance procedure is not to be resorted to with respect to matters not included within its scope in the collective bargaining agreement." 51A C.J.S. Grievances § 340 (2003) (citations omitted).

### 2. The ICA Erroneously Analyzed the Issue of the District Court's Jurisdiction Because the Doctrine of Preemption Is Inapplicable.

The ICA concluded that the district court had jurisdiction over Williams's petition based on the doctrine of preemption. *Williams*, 2008 WL 5182933, at *3–4.

The ICA first discussed our decision in *Santos* requiring an exhaustion of contractual remedies under a CBA. However, the ICA then stated that

> *preemption* of state court jurisdiction is not unlimited under the National Labor Relations Act (NLRA) or Hawai'i policy. In *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir.2001), the United State[s] Court of Appeal[s] for the Ninth Circuit held that certain actions under the NLRA were not *preempted* from state court jurisdiction. These actions included "torts of threatened violence, traditionally held not to be *preempted,* or intentional infliction of emotional distress, and defamation, both of which the Supreme Court has held to be excepted from Garmon's [4]

**4.** The ICA explained that *"Garmon"* refers to

*"San Diego Bldg. Trades Council v. Garmon, 359*

*pre-emption* rule even though they involve conduct arguably protected or prohibited by the NLRA." *Radcliffe*, 254 F.3d at 785 (citations omitted[) ].

*Id.* at *4.

The ICA then cited our decision in *Briggs v. Hotel Corp. of Pac.*, 73 Haw. 276, 831 P.2d 1335 (1992) for the proposition that " 'outrageous conduct, threats, intimidation, and words' which cause the plaintiff to suffer 'grievous mental and emotional distress as well as great physical damage' may also fall within an exception to the federal interest in the national labor policy and therefore permit state law recovery." *Williams*, 2008 WL 5182933, at *4 (quoting *Briggs*, 73 Haw. at 284, 831 P.2d at 1341). Finally, the ICA stated that "[t]he State has a substantial interest in protecting its citizens from the kind of abuse of which Williams complained. That interest is not diminished or *preempted* because it is related to matters contained in a CBA grievance process." *Id.* (emphasis added).

 Preemption is commonly defined as "[t]he principle, (derived from the Supremacy Clause [of the United States Constitution] ) that a federal law can supersede or supplant any inconsistent state law or regulation." *Black's* at 1217; *see also id.* at 303 (defining the term "complete-preemption doctrine" as "[t]he rule that a federal statute's force may be so extraordinary and all encompassing that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule"). In contrast to the doctrine of exhaustion's temporary divestment of jurisdiction, when a federal statute

preempts a state law claim, preemption *fully* divests the state-law court of all subject-matter jurisdiction over a particular issue. As we have stated in the context of employment law:

> "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law."

*Briggs*, 73 Haw. at 283, 831 P.2d at 1340 (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). Thus, the preemption doctrine is triggered when a court is presented with conflicting state and federal statutes.[5]

 Here, the district court was not presented with conflicting state and federal statutes because the NLRA does not apply to the City and County. The NLRA only applies to "employers," as defined by the NLRA. *See generally* 29 U.S.C. § 152(1) (2000). Under the NLRA, the term "employer" "*shall not include ... any State or political subdivision thereof*[.]" 29 U.S.C. § 152(2) (2000) (emphasis added). Aona and Williams's employer is the City and County of Honolulu, a political subdivision of the state of Hawai'i. *See* Haw. Const. art. VIII, § 1. Therefore, the NLRA does not apply

U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (Garmon preemption rule refers to preemption of state law by the NLRA). *Radcliffe*, 254 F.3d at 780 n. 6." *Williams*, 2008 WL 5182933, at *4 n. 3.

5. Conflicting state statutes can also trigger the preemption doctrine. Indeed, HRS chapter 89 preempts conflicting state statutes:

> This chapter shall take precedence over all conflicting statutes concerning this subject matter and shall preempt all contrary local ordinances, executive orders, legislation, or rules adopted by the State, a county, or any department or agency thereof, including the departments of human resources development

or of personnel services or the civil service commission.

HRS § 89–19 (1993 & Supp.2008). However, HRS § 89–19 does not apply here because Aona challenges the CBA and not the provisions of HRS chapter 89. *See Hawai'i Org. of Police Officers v. Soc'y of Prof. Journalists–Univ. of Hawai'i Chapter*, 83 Hawai'i 378, 403, 927 P.2d 386, 412 (1996) ("By its own language, HRS § 89–19 accords preemptive effect *to the provisions of HRS chapter 89* and not to the agreements entered into between parties pursuant to the authority, procedures, and rules established in HRS chapter 89." (emphasis added)).

and the ICA's discussion of preemption was irrelevant.

In sum, Aona is correct that the doctrine of preemption is inapplicable to the facts of this case. As a result, we hold that the ICA's application of preemption principles to conclude that Williams was not required to exhaust his contractual remedies was erroneous.

### 3. Despite the ICA's Error, It Correctly Concluded That the District Court Properly Exercised Jurisdiction Over Williams's Petition.

■ Although the ICA used an erroneous framework to determine that the district court had jurisdiction over Williams's petition, the ICA correctly concluded that the district court had jurisdiction because (1) Williams's petition involves conduct outside the scope of the CBA; (2) even if CBA remedies did apply, tort claims are excepted from the general rule that employees must exhaust their remedies under the CBA before seeking judicial relief; (3) the CBA did not provide Williams with an adequate remedy; and (4) public policy does not support limiting injunctions against harassment for employees subject to CBAs.

#### a. *exceptions to the exhaustion doctrine*

■ The doctrine of exhaustion is not absolute. "[E]xceptions to this doctrine exist, such as when pursuing the contractual remedy would be futile." *Poe v. Hawaii Labor Relations Bd.*, 97 Hawai'i 528, 536, 40 P.3d 930, 938 (2002). Likewise, "[a]n aggrieved party need not exhaust administrative remedies where no effective remedies exist." *Hokama*, 92 Hawai'i at 273, 990 P.2d at 1155. Furthermore, "[a]s a general proposition ... the contractual grievance procedure does not apply to tort actions." *Id.* (internal citations omitted). Finally, policy interests underlying the exhaustion doctrine may be outweighed by other interests. *See Vaughn v. Pac. Nw. Bell Tel. Co.*, 289 Or. 73, 611 P.2d 281, 290 (1980) ("We conclude that a worker claiming any type of unlawful employment discrimination ... is entitled to bring suit for injunctive relief pursuant to that statute, notwithstanding the availability of a remedy under the collective bargaining agreement. We reject defendant's argument that workers who have a remedy under a collective bargaining agreement are limited to that exclusive remedy. We hold that the state policy favoring exclusivity of collective bargaining agreement remedies does not foreclose the plaintiff's right to seek injunctive relief in this case.").

#### b. *Williams was not required to exhaust his contractual remedies because the conduct that Williams sought to enjoin was outside the scope of the CBA.*

■ In *Hokama*, we stated that "[f]or purposes of the exhaustion requirement, we must determine whether [the employee's] claims arise from the terms of the collective bargaining agreement." *Hokama*, 92 Hawai'i at 273, 990 P.2d at 1155. In order to determine whether Williams's claim arose from the terms of the CBA, we must look to the relevant CBA provisions.[6] According to

---

6. The CBA was not submitted into evidence at the district court. Pursuant to HRS § 641-2,

> [e]very appeal shall be taken on the record, and no new evidence shall be introduced in the supreme court. The appellate court may correct any error appearing on the record, but need not consider a point that was not presented in the trial court in an appropriate manner. No judgment, order, or decree shall be reversed, amended, or modified for any error or defect, unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant.

HRS § 641-2 (1993 & 2008 Supp.). Thus, as a general rule, we would not consider the terms of the CBA.

However, Aona states that "Aona attached as Appendix B to his opening brief a copy of the relevant portions of the written CBA and requested the ICA to take judicial notice of that document." It is not clear if the ICA took judicial notice of the CBA, but for the following reasons, we take judicial notice of the attached portions of the CBA.

Hawai'i Rules of Evidence (HRE) Rule 201 (1993), provides that judicial notice may be taken of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and that "[a] court may take judicial notice, whether requested or not," HRE Rule 201(c) "at any stage of the proceeding," HRE Rule 201(f). Indeed, "[t]he trial court may take judicial notice of a fact if it

section 15.02 of the CBA, "[t]he term grievance shall mean a complaint filed by a bargaining unit Employee, or by the Union, alleging a violation, misinterpretation, or misapplication of a specific section of this Agreement occurring after its effective date." Section 15.01 of the CBA requires that "[a] grievance that arises out of alleged Employer violation, misinterpretation, or misapplication of this Agreement, its attachment, and appendices shall be resolved as provided in Section 15." Section 15 of the CBA outlines the steps that must be taken to file a grievance.

Section 46.02a of the CBA provides that:

The Employer shall comply with all applicable Federal, State, or Local safety laws, rules and regulations (E.G., Chapter 12–205; Hawaii Administrative Rules, pertaining to protective clothing, shoes and accessories), including the Hawaii Workers Compensation Law. The Employer shall provide a workplace free from violence by providing safety and health training that includes recognition of conditions and behavior that may lead to or increase the risk of violence and the means and the methods to prevent or reduce that risk to Employees and supervisors during work hours.

Upon review of the facts alleged and issues raised in Williams's petition, it is clear that they do not arise from the terms of the CBA.

*See Blair v. Ing,* 96 Hawai'i 327, 332, 31 P.3d 184, 189 (2001) (in order to determine if an action was in tort or in the nature of assumpsit "this court has looked to the essential character of the underlying action in the trial court. . . . The character of the action should be determined from the facts and issues raised in the complaint, the nature of the entire grievance, and the relief sought." (internal citations omitted)). Williams's petition states that:

Robert Aona is causing me psychological stress due to the fact that he is a larger man than I am, he may not like my race and I fear he may attack me and cause me much more severe bodily and psychological harm than he already has. I feel severely threatened by Robert Aona due to his excessive size. He causes me anxiety when I see him.

Williams's petition does not constitute a CBA grievance because it does not "alleg[e] a violation, misinterpretation, or misapplication of a specific section of [the CBA] occurring after its effective date." Instead, it is clear that Williams is seeking a TRO and injunction as an individual against Aona solely in his individual capacity; the fact that Williams and Aona are also employee and supervisor is not relevant to the relief sought. In sum, Williams's petition is beyond the scope of the CBA.

is common knowledge or easily verifiable." *State v. Lord,* 63 Haw. 270, 272, 625 P.2d 1038, 1039 (1981) (citation omitted). Additionally,

an appellate court is not precluded from exercising its discretion to take judicial notice of certain facts where the trial court elected not to do so. *See Application of Pioneer Mill,* 53 Haw. 496, 497 P.2d 549 (1970). As we see it, the purpose of the judicial notice rule, and it would appear to be a wholesome one, is to eliminate the necessity of taking the time of the court and jury to make formal proof of a fact which cannot be disputed. *Van Welden v. Ramsey's,* [*Ramsay's*] *Inc.,* 199 Kan. 417, 430 P.2d 298 (1967).

*State v. Mayo,* 1 Haw.App. 644, 646, 623 P.2d 898, 899 (1981) (per curiam).

Aona argues that it is appropriate for the ICA and this court to take judicial notice of the CBA because the CBA is a "matter of public record." *See* HRS § 92F–3 (1993) (" 'Government record' means information maintained by an agency in written, auditory, visual, electronic, or other physical form."); HRS § 92F–11(a) (1993) ("All government records are open to public inspec-

tion unless access is restricted or closed by law."). In *Kaho'ohanohano v. State,* 114 Hawai'i 302, 328, 162 P.3d 696, 722 (2007), we took judicial notice of "[Employees' Retirement System of the State of Hawai'i (ERS)] reports for the fiscal years 2002, 2003, 2004, and 2005" because they were "a matter of public record, and appropriate for judicial notice, [as] their significance bears directly on the instant matter." *Kaho'ohanohano,* at 328, 162 P.3d at 722. We also noted that "[t]his case is a 'proper case' for judicial notice of subsequent events inasmuch as the issue of standing is only raised on appeal, and the parties were unable to develop the record regarding the ERS' standing." *Id.* at 329 n. 19, 162 P.3d at 723 n. 19.

We have the discretion to take judicial notice of the CBA because it is a matter of public record and easily verifiable. Also, like the standing issue in *Kaho'ohanohano,* the issue of exhaustion was raised for the first time on appeal and the record below was not adequately developed. Therefore, we take judicial notice of the CBA provisions appended to Aona's opening brief.

c. *Williams was not required to exhaust his contractual remedies because the conduct that Williams complained of was an intentional tort.*

 Additionally, even if the CBA applied, because the conduct Williams sought to enjoin was an intentional tort, he was not required to exhaust his remedies under the CBA. *See Hokama,* 92 Hawai'i at 273, 990 P.2d at 1155. In his petition, Williams alleged that Aona "palmed [him] on [his] left sided chest area causing an immediate sharp pain that required emergency medical treatment[.]" There is no indication that Williams assented to this bodily contact. Therefore, Aona's conduct clearly fits the common law intentional tort of battery, as "a defendant causes battery when he or she 'intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will.'" *Doe Parents No. 1 v. State, Dept. of Educ.,* 100 Hawai'i 34, 88, 58 P.3d 545, 599 (2002) (Acoba, J., dissenting) (quoting Dobbs, *The Law of Torts,* § 28 at 52–53 (2000) (citations omitted)).

 Additionally, Williams claims that Aona is causing him "psychological stress." The infliction of emotional distress is also a cognizable tort claim recognized by this court. *See, e.g., Kaho'ohanohano v. State,* 117 Hawai'i 262, 306, 178 P.3d 538, 582 (2008) (explaining that "a plaintiff may recover for [the negligent infliction of emotional distress], absent any physical manifestation of his or her psychological injury or actual physical presence within a zone of danger, where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case") (citation omitted); *Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 106, 73 P.3d 46, 60 (2003) ("Intentional infliction of emotional distress is an injury recognized by the Restatement as independently giving rise to liability."). Therefore, the conduct complained of in Williams's petition constitutes an exception to the general rule that Williams was required to exhaust his contractual remedies before seeking judicial relief.

The cases Aona relies upon do not change the analysis. Aona incorrectly implies that in *Santos* we held that the employee-plaintiff was required to exhaust his administrative remedies before seeking a judicial remedy for tort claims related to the intentional infliction of emotional distress. However, we did not hold that the employee was required to exhaust contractual remedies under the CBA before seeking a judicial remedy for tort claims. Instead, we held that a previous circuit court judgment that the employee "could not bring an action against the State [his employer] without first having exhausted his contractual remedies became final when [the employee] did not appeal the same and the time provided for such appeal expired. Thus, [the employee] is barred from relitigating that issue." *Santos,* 64 Haw. at 656, 646 P.2d at 967. As such, *Santos* does not conflict with a holding that the exhaustion of contractual remedies does not apply to tort claims.

Aona also claims that the ICA's decision in *Winslow* is controlling. In *Winslow,* an employee was denied paid administrative leave. Subsequently

> [the employee] filed a grievance ... in accordance with the grievance procedures set out [in the CBA] alleging that the failure to grant her request for paid administrative leave and transfer violated the terms of the collective bargaining agreement, specifically, Sections 11 (Discipline), 12 (Layoff), 49 (Sanitary Conditions), 50 (Staffing and Workload), and 46 (Working Conditions and Safety). In her grievance, appellant also made allegations of sex discrimination and unspecified Occupational Safety and Health Act (OSHA) violations.

*Winslow,* 2 Haw.App. at 53, 625 P.2d at 1049–50. Before completing the grievance process "appellant filed suit in circuit court against the State and the Union alleging essentially the same claims that were initially raised in the grievance." *Id.* at 53–54, 625 P.2d at 1050. The complaint included "allegations of negligence" and "infliction of emotional distress." *Id.* at 54 n. 3, 625 P.2d at 1050 n. 3. The ICA held that "where the terms of public employment are covered by a collective bargaining agreement pursuant to

HRS Chapter 89 and the agreement includes a grievance procedure to dispose of employee grievances against the public employer, an aggrieved employee is bound by the terms of the agreement." *Id.* at 55, 625 P.2d at 1050.

Although *Winslow* required the employee to exhaust her contractual remedies for claims that included claims in tort, the facts and circumstances in *Winslow* are distinguishable from those in the instant Application. It is true that the employee in *Winslow* included the tort claim of intentional infliction of emotional distress in her complaint; however, the tort claim arose out of her primary claim that she was denied paid administrative leave in violation of the terms of the CBA. Here, Williams's tort claims of battery and "psychological stress" form the bases for his entire petition. Unlike the employee in *Winslow,* Williams does not allege any violation of the CBA. Nor does he name the City and County as a party to his petition.

Additionally, to read the ICA's decision in *Winslow* broadly as requiring the exhaustion of contractual claims for all tort claims would be inconsistent with our later decision in *Hokama,* where we stated that "[a]s a general proposition, we agree that the contractual grievance procedure does not apply to tort actions." *Hokama,* 92 Hawai'i at 273, 990 P.2d at 1155 (internal citations omitted). As such, the district court's exercise of jurisdiction was not inconsistent with *Winslow.*

d. *Williams was not required to exhaust his contractual remedies because the CBA did not provide an adequate remedy*

■ The ICA concluded that "Aona failed to demonstrate that a written remedy was available under the CBA grievance procedure that could protect Williams from future harassment. Because Aona did not demonstrate that the CBA provides a reasonable alternative to an injunction order, the presumed goal of such a policy is not applicable." *Williams,* 2008 WL 5182933, at *4 (footnote omitted).

Aona argues that the ICA erred because (1) the CBA demonstrates the City and County's concern over workplace violence

and contractual obligation "to provide a workplace free from violence by providing ... the method and means to prevent or reduce the risk to Employees and supervisors," and (2) testimony before the district court from Deputy Corporation Counsel for the City and County expressed the City and County's position that "DES wished to manage the worksite itself, without court interference, and that DES can manage the situation in various ways, such [sic] arranging no direct dealings between Williams and Aona, reassignments, or having a third party present during those times that Williams and Aona might have to be together."

The ICA correctly concluded that the CBA did not provide an effective remedy for Williams. *See Hokama,* 92 Hawai'i at 273, 990 P.2d 1150; *Fruit and Vegetable Packers and Warehousemen Local 760 v. Morley,* 378 F.2d 738, 745 (9th Cir.1967) (stating that "the exhaustion of intraunion remedies doctrine cannot apply unless there is available from the union a remedy which is neither uncertain nor futile. Inherent in this proposition is the idea that to invoke the exhaustion principle the union must show that there was a procedure available to the members within the union structure reasonably calculated to redress the particular grievance complained of.").

The CBA provision Aona claims is controlling is titled *workplace* safety. Williams's petition was not limited to the workplace. Instead, Williams sought a TRO and injunction to enjoin Aona from "contacting, threatening, or physically harassing" Williams or anyone residing at his residence; calling Williams on the phone; and "entering or visiting" Williams's "residence, including yard and garage" and "place of employment." In other words, Williams asked the district court to regulate conduct not only in the workplace but beyond the workplace-places where the CBA has no effect. Therefore, as the relief Williams sought was not limited to the workplace, the CBA could not provide an adequate remedy.

Additionally, the CBA did not present specific steps that would be taken in the event of a physical altercation between an employee

and a supervisor. The CBA's broad mandate to provide unspecified "means to prevent or reduce the risk [of violence] to Employees and supervisors" is not specific enough to provide an adequate alternative to the specific terms of a TRO and injunction against harassment.

▆▆▆▆▆ Furthermore, Aona's argument that the ICA should have considered the testimony of the Deputy Corporation Counsel regarding the steps that the City and County would take to manage the work site is also unavailing. The CBA is a contract between the City and County and United Public Workers AFSCME, Local 646, AFL–CIO. When interpreting a contract, it is well-settled that

> courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous. In fact, contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists.

*United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Dawson Int'l, Inc.*, 113 Hawai'i 127, 140, 149 P.3d 495, 508 (2006) (quoting *State Farm Fire & Cas. Co. v. Pac. Rent–All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citations omitted)). As such, the ICA was not required to consider the Deputy Corporation Counsel's testimony regarding interpretation of the CBA contractual terms.

e. *public policy*

▆▆▆▆ We agree with the ICA's conclusion that "[t]he State has a substantial interest in protecting its citizens from the kind of abuse of which Williams complained." *Williams,* 2008 WL 5182933, at *4. The broad availability of a TRO and injunction serves the public interest by preventing physical and psychological violence.

Allowing an injunction against harassment in cases like this does not conflict with the policy favoring the exhaustion of contractual remedies. Williams did not attempt to circumvent the contractual grievance process. Instead, he filed his petition in conjunction with a grievance. According to Williams, he only wanted the injunction to last until the workplace violence investigation was concluded. A TRO and injunction provide timely intervention and hopefully prevent future harassment. As Williams explained in his answering brief—filed more than nine months after the district court hearing—"I did file a grievance. To date there has not been a response. This was an assault that needed an immediate response. It takes a long time for [sic] any action is taken on a grievance." Depriving employees of the opportunity to seek a TRO and injunction against harassment merely because they were parties to a CBA would deprive employees of an immediate remedy against violence.

### IV. CONCLUSION

Accordingly, while the ICA erred when it affirmed the district court's jurisdiction on the basis of the doctrine of preemption, we hold that the district court had jurisdiction on the alternative bases discussed in detail in this opinion. Consequently, in accordance with Rule 36(d)(2) of the Hawai'i Rules of Appellate Procedure, we (1) vacate the judgment entered by the ICA on December 30, 2008; (2) vacate the part of the ICA's Memorandum Opinion concerning preemption; and (3) affirm the district court's July 17, 2007 Order Granting Petition for Injunction Against Harassment.